**Patrick W. SIMMONS, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Association of American Railroads, Intervenors.**

**No. 82–1421.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 20, 1983.

Decided Sept. 18, 1987.

Gordon P. MacDougall, Washington, D.C., for petitioner.

Cecelia E. Higgins, Atty., I.C.C., with whom John Broadley, Gen. Counsel, and Ellen D. Hanson, Associate Gen. Counsel, I.C.C., and John J. Powers, III, and Kenneth P. Kolson, Attys., Dept. of Justice, Washington, D.C., were on joint brief, for respondents. Evelyn G. Kitay, Atty., I.C.C., Washington, D.C., also entered an appearance for respondent I.C.C.

James I. Collier, Jr., was on brief, for intervenors. J. Thomas Tidd, Washington, D.C., also entered an appearance for intervenors.

Before ROBINSON and MIKVA, Circuit Judges, and VAN DUSEN,[*] Senior Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Patrick W. Simmons, the Illinois Legislative Director of the United Transportation Union, petitions for review of a revised regulation of the Interstate Commerce Commission pertaining to applications for a Section 10901 authorization for construction, acquisition or operation of a railroad line.[1] Simmons asserts that prior to revision the regulation excluded from Section 10901 applications by a common carrier[2] to

---

[*] Of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

[1]. 49 C.F.R. § 1150.1(a); see 49 U.S.C. § 10901 (1982).

[2]. The Interstate Commerce Act defines "common carrier" as, *inter alia*, a "rail carrier," 49 U.S.C. § 10102(4) (1982), and "[r]ail carrier" as "a person providing railroad transportation for compensation," *id.* § 10102(19).

acquire a rail line owned or operated by another carrier, and instead treated such proposals as applications for consolidation, merger or acquisition of control under Section 11343.[3] The amended regulation declares that an application by an existing carrier to acquire a rail line owned by a noncarrier falls within the purview of Section 10901, even if the line is being operated by another carrier prior to acquisition.[4] The statutory provision governing the transaction may be important, for Section 11343 requires the Commission to exact at least a specified level of labor protection for affected employees before the transaction can be authorized,[5] while the Commission's responsibility under Section 10901 is at most an exercise of discretion to determine whether and in what degree labor protection should be made a condition to approval.[6]

Simmons claims that the revised regulation is the product of an impermissible self-expansion of Commission power under Section 10901 and an undue diminution of labor protection available to employees of acquired rail lines.[7] He argues that there is no legal basis for the jurisdictional rule stated in the new regulation,[8] and that the Commission departed without explanation from its long-standing interpretation of the statutory provisions involved.[9] We find that the challenged revision did not undertake a switch in any segment of the Commission's jurisdiction from Section 11343 to Section 10901, and that it is a fair reading of the statutory scheme.

## I. BACKGROUND

### A. *The Statutory Backdrop*

One of the cornerstones of the Nation's modern rail policy is promotion of competition in acquisitions and operation of railroads.[10] Nonetheless, Congress has long evinced a reluctance to sacrifice the job security of rail workers to the exigencies of the free market. This concern found expression in the Transportation Act of 1940, which was designed in part to facilitate mergers and acquisitions of railroads.[11] That legislation mandated protection for displaced rail workers,[12] in recognition that the rivalry Congress sought to encourage could ofttimes have a significant adverse impact on employees of affected lines.[13] Today, the Commission is required to impose labor protective conditions on transactions most likely to implicate employee interests—those involving consolidation, merger or acquisitions of control of carriers by carriers.[14] In contrast, the Commis-

---

3. Brief for Petitioner at 12; see 49 C.F.R. § 1120.1(a) (1981); 49 U.S.C. § 11343 (1982).

4. 49 C.F.R. § 1150.1(a) (1986). The amended regulation further states that "acquisition by a carrier of an active rail line owned by a carrier is covered by § 11343." *Id.*

5. 49 U.S.C. §§ 11343, 11347 (1982 & Supp. III 1985). See notes 20–21 *infra*.

6. 49 U.S.C. § 10901(e) (1982). See notes 13–14 *infra* and accompanying text.

7. Brief for Petitioner at 8–10, 12. Simmons challenges only subpart A of the regulation, which relates to applications pursuant to § 10901. *Id.* at 4. We thus have no occasion to consider subpart B, pertaining to certificates for designated operators, or subpart C, addressing state-sponsored operations over abandoned rail lines. See *Application Procedures for a Certificate to Construct, Acquire or Operate Railroad Lines,* 365 I.C.C. 516, 527, 531, 532 (1982) (Notice of Final Rules) [hereinafter Notice of Final Rules].

8. Brief for Petitioner at 8–10.

9. *Id.* at 12.

10. See 49 U.S.C. § 10101a(1) (1982) (statement of rail transportation policy).

11. See Pub.L. No. 76–785, 54 Stat. 898 (1940).

12. *Id.,* 54 Stat. 906–907.

13. See, e.g., 84 Cong.Rec. 9884 (1939) (statement of Rep. Harrington) ("if you can consolidate railroads without disemploying workers, I would like to know how"); *id.* (statement of Rep. Warren) ("[c]ertainly [rail workers] must realize these coordinations and consolidations and shakedowns will ultimately mean the loss of thousands and thousands of their own jobs").

14. 49 U.S.C. §§ 11343, 11347 (1982 & Supp. III 1985); see *Prairie Trunk Ry.—Acquisition and Operation,* 348 I.C.C. 832, 851–852 (1977) (labor-protective provisions are most appropriate when employees of two or more active carriers are affected by a transaction). Intermodal ownership derived from rail-motor acquisitions also implicate mandatory labor protection under 49

sion is given discretion to prescribe such conditions when needed in transactions involving only a single carrier proposing both to construct and operate a new rail line, since these are less likely to put workers' interests in jeopardy.[15]

The instant controversy arose from the Commission's formulation of the introductory paragraph of its present Rule 1150,[16] which specifies the procedure for applications submitted pursuant to Section 10901 of the Staggers Rail Act of 1980.[17] Section 10901 governs construction, acquisition and operation of rail lines,[18] and invests the Commission with discretion to determine whether arrangements should be made for protection of rail employees affected by an application envisioning both construction and operation of a new rail line.[19] Transactions not encompassed by Section 10901 may fall within Section 11343, which pertains to transactions between carriers involving consolidation, merger and acquisition of control of rail lines,[20] and requires the Commission to institute specific measures to protect employees exposed thereby.[21]

U.S.C. §§ 10505(g)(1)–(2), 11344(c), 11347 (1982 & Supp. III 1985). See *Regular Common Carrier Conference v. United States,* 820 F.2d 1323, 1325–1326 (D.C.Cir.1987). The Commission has enumerated the minimum employee protections required in § 11343 transactions. See generally *New York Dock Ry.,* 360 I.C.C. 60, *aff'd,* 609 F.2d 83, 100–101 (2d Cir.1979). The Commission may also impose conditions more protective of rail workers than those mandated by § 11347. *Railway Labor Executives' Ass'n v. United States,* 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950). See generally *United Transp. Union v. Norfolk & W. Ry.,* 822 F.2d 1114, 1115 (D.C.Cir.1987).

15. See 49 U.S.C. § 10901(e) (1982).

16. 49 C.F.R. § 1150.1(a) (1986). The regulation originally was codified at 49 C.F.R. § 1120.1(a), but was renumbered at the time of the amendment.

17. 49 U.S.C. § 10901 (1982).

18. Section 10901 (a) states in relevant part:
  (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may—
  (1) construct an extension of any of its railroad lines;
  (2) construct an additional railroad line;
  (3) acquire or operate an extended or additional railroad line;
      *    *    *    *    *    *
  only if the Commission finds that the present or future public convenience and necessity require or permit the construction or acquisition (or both) and operation of the railroad line.

19. *Id.* § 10901(e). As a condition to approval of such a transaction, the Commission may, at its discretion, require carrier-applicant "to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected thereby no less protective of and beneficial to the interests of such employees than those established pursuant to section 11347 of this title." *Id.;* see note 21 *infra.*

20. The transactions governed by § 11343 include, *inter alia,*
  (2) a purchase, lease, or contract to operate property of another carrier by any number of carriers[;]
  (3) acquisition of control of a carrier by any number of carriers[;]
  (4) acquisition of control of at least 2 carriers by a person that is not a carrier[;]
  (5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.
*Id.* § 11343(a). In addition, § 11343(b) states:
  A person may carry out a transaction referred to [above] or participate in achieving the control or management, including the power to exercise control or management, in a common interest of more than one of those carriers, regardless of how that result is reached, only with the approval and authorization of the Commission under this subchapter. In addition to other transactions, each of the following transactions are considered achievements of control or management:
  (1) A transaction by a carrier has the effect of putting that carrier and persons affiliated with it, taken together, in control of another carrier.
     *    *    *    *    *    *
  (3) A transaction by at least 2 persons acting together (one of whom is a carrier or is affiliated with a carrier) has the effect of putting those persons and carriers and persons affiliated with any of them, or with any of those affiliated carriers, taken together, in control of another carrier.
*Id.* § 11343(b).

21. Section 11347 of the Act governs employee protective arrangements in § 11343 transactions and provides, *inter alia,* that the Commission's "order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission...." 49 U.S.C. § 11347 (Supp. III 1985).

### B. *The Original and Proposed Rules*

Rule 1150 originally did not explicitly identify the statutory sections it was intended to implement, but all the transactions referred to in the rule—construction, extension, acquisition, and operation of rail lines—fall under the rubric of Section 10901. And the original rule did not mention the Commission's jurisdiction under Sections 10901 or 11343, but Simmons claims that one provision contained therein did implicitly sketch such jurisdictional boundaries:

> Applications for certificates of convenience and necessity [under Section 10901] shall set forth the following information:
>
> *  *  *  *  *  *
>
> (d) Whether it is proposed (1) to construct a new line of railroad or an extension of an existing line of railroad, or (2) to acquire and operate, or to operate, a line of railroad not at the time owned or being operated by a common carrier.[22]

In 1981, the Commission issued a notice of proposed rulemaking advising that revisions were necessary to correspond the regulation with current legislation and streamline the application process.[23] The Commission explained therein that "[a]cquisition of an active rail line by a carrier is covered by 49 U.S.C. [Section] 11343 ...,"[24] and accordingly proposed the following jurisdictional statement:

Existing carriers require approval under Section 10901 only to construct or operate [a rail line in interstate commerce], since acquisition of an active rail line by a carrier is covered by 49 U.S.C. [Section] 11343.[25]

Following publication of the notice, several groups objected to the Commission's pronouncement that "acquisition of an active rail line by a carrier is covered by 49 U.S.C. [Section] 11343." The Association of American Railroads argued that this "blanket statement" excluded from Section 10901 several transactions properly within its ambit, including purchase of a rail line by a carrier already leasing the line from its noncarrier owner, and acquisition by a carrier of a line on the verge of abandonment.[26] Conrail advanced the claim that Section 11343 should apply only when a carrier seeks to acquire control of a rail line through "unification, consolidation or merger," and that all other transactions were correctly subsumed by Section 10901.[27]

### C. *The Amended Rule*

The Commission's final rule on the subject substantially incorporated the description of Section 10901 jurisdiction proffered by Conrail and the Association of American Railroads. Noting that Section 10901 was "essentially directed at transportation-oriented activities of a single carrier," and

---

22. 49 C.F.R. § 1120.1 (1981); Brief for Petitioner at 12–14. Simmons argues that subsec. (d) suggests that applications to acquire a rail line owned or being operated by a carrier could not be filed under § 10901, and thus had to be brought under § 11343. *Id.*

23. *Application Procedures for Certificate to Construct, Acquire or Operate Railroad Lines,* 365 I.C.C. 236, 242 (1981) (Notice of Proposed Rulemaking) [hereinafter Notice of Proposed Rulemaking]. The sole statutory development referred to in the notice of rulemaking liberalized the standard for granting certificates of public convenience and necessity. See Pub.L. No. 96–448, 94 Stat. 1928 (codified at 49 U.S.C. § 10901(a) (1982)).

24. Notice of Proposed Rulemaking, *supra* note 23, at 237.

25. Notice of Proposed Rulemaking, *supra* note 23, 365 I.C.C. at 242.

26. Comments of Association of American Railroads before the Interstate Commerce Commission, *Application Procedures for a Certificate to Construct, Acquire or Operate Railroad Lines,* 2–4 (Oct. 15, 1981), Joint Appendix (J. App.) 33–35.

27. Letter from Charles E. Mechem, General Attorney of Conrail, to Ellen D. Hanson, Interstate Commerce Commission (Sept. 9, 1981), J.App. 20. Simmons also commented on aspects of the proposed rule, but did not object in any way to the jurisdictional statement contained therein. Comments of Patrick W. Simmons before the Interstate Commerce Commission, *Application Procedures for Certificate to Construct, Acquire or Operate Rail Lines,* (Oct. 15, 1981), J.App. 27–30.

that Section 11343 was "analytically more appropriate for dealing with the unification of *existing* railroad facilities," the Commission concluded that "Section 11343 is applicable only to acquisitions where both buyer and seller are carriers....."[28] Accordingly, the regulation was "modified to clarify that acquisitions by a carrier of an active rail line *owned by a carrier* is covered by Section 11343."[29] The revised regulation embodies the Commission's jurisdictional interpretations:

> Existing carriers require approval under section 10901 only to construct a new rail line or operate a line owned by a non-carrier, since acquisition by a carrier of an active rail line owned by a carrier is covered by 49 U.S.C. § 11343.[30]

## D. *The Petition to Reopen*

Simmons petitioned for reopening of the rulemaking proceeding, attacking the Commission's concept of the jurisdictional scope of Sections 10901 and 11343.[31] He contended that the Commission's position that Section 11343 governs acquisitions only when both buyer and seller are carriers was a "novel theory," without support in either legislation or prior Commission decisions.[32] The Commission denied the petition.[33]

While acknowledging that some of its early decisions were ambiguous on the jurisdictional reach of Sections 10901 and 11343,[34] the Commission asserted that the new regulation was a proper reading of those sections[35] and an accurate reflection of its current policy and practice.[36]

Simmons now argues here that the revised regulation is a significant departure from the Commission's prior construction of Section 10901 jurisdiction, and that the Commission has not adequately explained its change of course.[37] The Commission retorts that the amended regulation is not an unelucidated policy change but rather a "reword[ing]" to harmonize the language of the regulation with the import of its previous decisions.[38] The American Association of Railroads echoes the Commission's contention that the new regulation comports with the relevant statutes and prior rulings,[39] and urges us to accord substantial deference to the Commission's interpretation.[40]

## II. ANALYSIS

▉▉▉ While an agency is always expected to rationalize its action in the rulemak-

---

**28.** Notice of Final Rules, *supra* note 7, 365 I.C.C. at 518 (emphasis in original). The Commission recognized that "[t]he distinction [between § 10901 and § 11343 jurisdiction] is an important one, in view of the discretion afforded the Commission in imposing labor protective conditions under section 10901." *Id.*

**29.** *Id.* (emphasis in original).

**30.** *Id.* (codified at 49 C.F.R. § 1150.1(a) (1986).

**31.** Petition to Reopen, *Application Procedures for Certificate to Construct, Acquire or Operate Railroad Lines* (Mar. 17, 1982), J.App. 70–72. Simmons urged additionally that the Commission had improperly characterized the proceeding as "procedural," and thereby had deprived him of notice of significant substantive aspects of the new rule. *Id.* at 1–2, J.App. 70–71. The Commission rejected this claim and Simmons does not renew it here.

**32.** *Id.* at 2, J.App. 71.

**33.** Denial of Petition to Reopen, *Application Procedures for Certificate to Construct, Acquire or Operate Railroad Lines* (I.C.C. May 25, 1982) at

5, J.App. 84 [hereinafter Denial of Petition to Reopen].

**34.** Denial of Petition to Reopen, *supra* note 33, at 2, J.App. 81.

**35.** The Commission quoted § 11343(a)(2), which confers jurisdiction over "a purchase, lease, or contract to operate property of another carrier by any number of carriers," 49 U.S.C. § 11343(a)(2) (1982), and concluded from that provision that "applications by non-carriers to acquire rail lines are properly considered under section 10901 rather than section 11343." Denial of Petition to Reopen, *supra* note 33, at 2, J.App. 82.

**36.** *Id.*, J.App. 81 (citing *Winnebago Farmers' Elevator Co. v. Chicago & NW. Transp. Co.*, No. 28421 (I.C.C. Aug. 14, 1978)).

**37.** Brief for Petitioner at 12–13.

**38.** Brief for Respondents at 12.

**39.** Brief for Intervenor at 7–8.

**40.** *Id.* at 9–10.

ing context,[41] a new rule constituting a departure from past policy or practice amplifies the need for adequate explanation. As we have hitherto observed,

> an agency changing its course [must] supply a reasoned analysis indicating that prior policies are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute.[42]

Similarly, the Supreme Court has warned that "[w]hatever the ground for departure from prior norms, ... it must be clearly set forth so the reviewing court may understand the basis for the agency's action and so may judge the consistency of the action with the agency mandate." [43] The Commission must, at minimum, satisfactorily explain its *volte-face* with reference to the objectives underlying the statutory scheme it purports to construe.[44]

■ Simmons asserts that the new regulation must fail because the Commission did not provide sufficient explanation for what he terms a change of course. But we think Simmons does not and cannot show that a deviation from prior Commission practice actually took place. For while the new rule delineates clearly the Commission's view of the jurisdictional spheres of Sections 10901 and 11343, and announces plainly that acquisition by a carrier of a rail line owned by a noncarrier [45] will be treated

under Section 10901, the original regulation did not explicitly address this or any other aspect of Commission jurisdiction.

Simmons points, however, to Subsection (d) of the old rule, which provided that applicants must specify "[w]hether it is proposed ... to acquire and operate ... a line of railroad not at the time owned or being operated by a common carrier," [46] and insists that this provision should be viewed as a jurisdictional statement placing carrier acquisition of carrier-operated noncarrier-owned lines squarely within the ambit of Section 11343. We reject that construction. The quoted language can be correctly understood only in the context of the regulation as a whole. Section 1120.1 was captioned "Information to be contained in applications." [47] It proceeded to enumerate the data applicants had to include in their petitions for approval: corporate name,[48] date and state of incorporation,[49] legal representative,[50] and, finally, the nature and specifics of the proposed transaction.[51] Section 1120.1 did not say whether particular types of transactions would be treated under Section 10901 or Section 11343; indeed, Section 11343 was not even mentioned. Thus we read Subsection (d), in context, as nothing more than a directive to include designated information in an application for a certificate of public convenience and necessity, rather than as a determination of when jurisdiction under Section 10901 may be invoked.

---

**41.** See, e.g., *Amoco Oil Co. v. EPA,* 163 U.S.App. D.C. 162, 179, 501 F.2d 722, 739 (1974) (agency's explanation in a rulemaking proceeding "must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted"); *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 701 (2d Cir.1975) (same); see also *Illinois Commerce Comm'n v. ICC,* 249 U.S.App. D.C. 389, 395, 776 F.2d 355, 361 (1985).

**42.** *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

**43.** *Atchison, T. & S.F. Ry. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350, 362 (1973).

**44.** *Southwestern Elec. Power Co. v. FERC,* 258 U.S.App.D.C. 170, 171, 810 F.2d 289, 290 (1987) (when an agency reinterprets its mandate, it "is

bound to reason why, so as to show that its new path marks out a permissible construction of the Act"); *Independent U.S. Tanker Owners v. Dole,* 258 U.S.App.D.C. 6, 11, 809 F.2d 847, 852 (1987) (same); *Columbia Broadcasting Sys., Inc. v. FCC,* 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971).

**45.** See notes 28–30 *supra* and accompanying text.

**46.** 49 C.F.R. § 1120.1(d) (1981).

**47.** See *id.* § 1120.1.

**48.** *Id.* § 1120.1(a).

**49.** *Id.* § 1120.1(c).

**50.** *Id.* § 1120.1(k).

**51.** *Id.* § 1120.1(d)–(i).

Simmons argues that, because Subsection (d) ordered the applicant to specify whether it proposed "(1) to construct a new line of railroad or an extension of an existing line of railroad, or (2) to acquire and operate, or to operate, a line of railroad not at the time owned or being operated by a common carrier,"[52] the Commission must have intended that any transaction not included in category one or two should be treated under Section 11343. We disagree. A review of agency caselaw reveals clearly that the Commission has never considered compliance with the terms of Subsection (d) to be a prerequisite to proceeding under Section 10901. For example, the Commission has long treated applications by non-carriers to acquire rail lines owned or operated by a common carrier under the aegis of Section 10901[53] even though that transaction is not embraced by the terms of Subsection (d). Under the superseded regulation, then, the Commission construed the transactions featured in Subsection (d) as an illustrative, rather than exhaustive, list of Section 10901 events.[54]

■ We thus conclude that the Commission did not breach any duty of additional explanation because the record does not disclose any departure from past policy or practice. It is also clear that the jurisdictional statement in the Commission's new regulation is a reasoned and permissible effectuation of the statutory scheme. Our examination of the language and legislative history of Sections 10901 and 11343 reveals that neither provision sharply addresses the transaction we consider herein: acquisition by a carrier of a rail line owned by a noncarrier but operated by a carrier.[55] In

the face of this circumstance, the Commission's interpretation is legitimate so long as its "answer is based on a permissible construction of the statute."[56] After careful consideration, the Commission concluded that such transactions would generally only implicate the property and operations of a single carrier,[57] and accordingly declared that they were more properly treated under Section 10901. We find that conclusion in accord with the spirit of Sections 10901 and 11343, and we thus affirm the Commission.

*So ordered.*

---

**52.** 49 C.F.R. § 1120.1(3) (1981).

**53.** See, e.g., *Prairie Trunk Ry.—Acquisition & Operation, supra* note 14; *Iowa Term. Ry. Co.—Acquisition & Operation,* 312 I.C.C. 546 (1961).

**54.** "It is well established that where administrative regulations are ambiguous on their face, the court should look to the construction which the responsible agency has given to them." *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1055 (Temp.Emer.Ct.App.1978); see also *Environmental Defense Fund, Inc. v. Costle,* 211 U.S.App.D.C. 313, 330, 657 F.2d 275, 292 (1981) (agency's construction of its own regulation is entitled to great deference).

**55.** See notes 18, 20 *supra.*

**56.** *Chevron, USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 703 (1984); see also *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23, 34 (1981); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965).

**57.** See notes 28–30 *supra* and accompanying text. This conclusion is reasonable because in the usual case the sale of property by a noncarrier owner, without more, would not affect the property of a carrier holding a contract to operate the transferred line.