CARIBBEAN SHIPPERS ASSOCIATION,
INC., Petitioner,

v.

SURFACE TRANSPORTATION BOARD
and United States of America,
Respondents,

NPR, Inc. and TAG/ICIB,
Inc., Intervenors.

No. 97–1346.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 14, 1998.

Decided June 12, 1998.

Rick A. Rude argued the cause and filed the briefs for petitioner.

Craig M. Keats, Associate General Counsel, Surface Transportation Board, argued the cause for respondents, with whom Joel I. Klein, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, and Henri F. Rush, General Counsel, Surface Transportation Board, were on the brief.

Dennis N. Barnes and John J. Mullenholz were on the joint brief for intervenors NPR, Inc. and TAG/ICIB, Inc.

Before: SILBERMAN, HENDERSON, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Caribbean Shippers Association, Inc. petitions for review of a Surface Transportation Board order dismissing its complaint against NPR, Inc. and TAG/ICIB, Inc. (TAG). Car-

ibbean alleges that NPR and TAG violated the statutory provision which prohibits federally regulated water carriers or their agents from disclosing confidential commercial information regarding shippers' goods to competitors. We deny the petition.

### I.

Caribbean Shippers Association's members are *non-vessel* operating common carriers that ship containerized freight between the continental United States and Puerto Rico. These "carriers" are similar to surface freight forwarders; they aggregate small shipments at origin, buy space on a vessel, and provide distribution services at destination. NPR and two other *vessel* operating carriers—Sea–Land Service, Inc. and Crowley American Transport, Inc.—control approximately 90% of the market in the United States/Puerto Rico route. All three utilize TAG, a private policing organization which inspects cargo, to ensure tariff compliance. TAG obtains from the carriers the information that customers furnish along with their cargo. It may open and examine the contents of shipments to verify the accuracy of that information and thus assure that customers like Caribbean's members are adhering to the carriers' tariffs, which are on file with the STB.

In 1996, Caribbean complained to the Board that NPR and TAG had disclosed shipment and routing information to its members' competitors and to other water carriers in violation of 49 U.S.C. § 14908(a)(1), which provides:

A [water carrier or broker subject to regulation by the Surface Transportation Board] or an officer, receiver, trustee, lessee, or employee of that carrier or broker, or another person authorized by that carrier or broker to receive information from that carrier or broker may not disclose to another person, except the shipper or consignee, ... information about the nature, kind, quantity, destination, consignee, or routing of property tendered or delivered to that carrier or broker for transportation ... without the consent of the shipper or consignee *if that information may be used to the detriment of the shipper or consign-*

*ee or may disclose improperly to a competitor the business transactions of the shipper or consignee.*

(Emphasis added.) Although Caribbean initially contended that TAG directly disclosed information gained in the process of conducting inspections for carriers, its later theory was that NPR's disclosure of confidential information to TAG was tantamount to disclosure to Sea–Land and Crowley, the other carriers for which TAG performs inspections. According to petitioner, because TAG policed for the three different carriers, it impermissibly served as an "informational clearinghouse" with "a vast archive of confidential commercial information," which it used for the benefit of its clients. It asked the Board to issue a cease and desist order and to further require TAG to return all of the records it had obtained from NPR to the carrier's customers. The Board characterized Caribbean's argument in the following manner:

when it is working for Crowley, TAG may pay particular attention to a shipper that it knows, as a result of its work for NPR or Sea–Land, has a history of misdescribing shipments. *It is this ability to use information it has obtained while working for one [carrier] in the course of inspections for another [carrier] that [Caribbean] characterizes as an unlawful disclosure of information.*

*Caribbean Shippers Ass'n, Inc.,* No. WCC–100 (Mar. 18, 1997) (emphasis added). Caribbean never made quite clear to the Board why the arrangement between the three water carriers and TAG caused it "detriment"— or harm of any sort. The only harm it identified was its assertion that the carriers used TAG to purposefully delay their members' shipments—and thereby induce their customers to ship directly with the water carriers. But it did not explain why TAG would be better able to delay shipments because it inspected for all three carriers.

The Board dismissed Caribbean's complaint as not stating "reasonable grounds for investigation and action." 49 U.S.C. § 14701(b) (1994). The Board reasoned that the statute was aimed at "actual disclosures of information" not the transfer of information among TAG employees concerning lessons learned about the practices of certain

shippers. And even if TAG's operations constituted a disclosure within the meaning of § 14908(a)(1), it was not a prohibited disclosure. TAG should be encouraged to use the experience it gained in working for all three carriers to prevent fraud.

## II.

 Petitioner challenges the Board's statutory interpretation, suggesting that § 14908(a)(1)'s "disclosure" has a plain meaning that includes TAG's internal use of information acquired from inspecting for one carrier in conducting inspections for another carrier. We disagree. THE RANDOM HOUSE COLLEGE DICTIONARY (REVISED ED.1980) 378 defines "disclose" to mean: "1. to make known; reveal or uncover. 2. to cause to appear; lay open to view." Under this definition, it does not seem that TAG discloses a shipper's confidential information to anyone. TAG does not "reveal" or "make known" any information it receives from one carrier to other carriers; indeed, its contracts with its clients explicitly prohibit TAG from doing so. And it certainly does not lay such information open to public view. We think the statute's term "disclosure" is at least ambiguous as applied to this situation and therefore under *Chevron* we must defer to the Board's construction if it is a permissible one. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

That the Board's interpretation of "disclosure" is permissible we have no doubt. Caribbean contends that § 14908(a)(1) should be read in tandem with § 14908(b)(3) (1994), a statutory exemption allowing a carrier to give information "to another carrier or its agent to adjust mutual traffic accounts in the ordinary course of business." Petitioner asserts that § 14908(b)(3) is the *only* circumstance under which a carrier is permitted to disclose confidential shipper information to another carrier. But that argument, a tenuous use of the *expressio unius* canon, *see*

*Shook v. District of Columbia Fin. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 783 n. 5 (D.C.Cir.1998), assumes that TAG does "disclose" information—which is the very issue in this case.

It is impossible to imagine any reason why TAG's operation can be thought to offend the obvious policy grounds that underlie § 14908(a)(1)—the provision is clearly designed to prevent the disclosure of useful competitive information to other shippers.[1] Certainly petitioner is not entitled to seek less vigilant enforcement of tariff compliance activities. The statute governing STB-regulated water carriers expressly requires that carriers file their rates in tariffs, and that they collect only the filed tariff rate. 49 U.S.C. § 13702 (1994). The Board believes TAG performs a valuable service by helping carriers comply with this "filed rate doctrine." *Cf. Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 132, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (explaining that under the Interstate Commerce Act, collection of filed rates is "utterly central" to administration of the statute). Were the STB to adopt Caribbean's interpretation of the statute, a company such as TAG would no longer be as effective at preventing fraud. It would either have to limit its inspection activities to one carrier—an option under which it probably could not stay in business—or set up Chinese walls between units inspecting for different carriers. Under either scenario, the outcome would be less effective tariff enforcement and presumably more undetected violations of the law.[2]

At oral argument, we gained the impression that petitioner's real concern is that so long as TAG performs the inspection service for all three carriers it is more difficult for petitioner to play one against the other. If a shipper is unhappy about the manner in which TAG categorizes its merchandise, for example, it is hard for that shipper to gain more favorable treatment elsewhere because each of the major carriers in the market uses

---

1. Petitioner claims that as freight forwarders its members actually compete with the carriers. Even though that is true in some sense, petitioner never shows why TAG's practice causes competitive injury and, in any event, the Commission reasonably interpreted the section to protect only against disclosure to *shipper* competitors.

2. For similar reasons, even if petitioner's interpretation of disclosure were accepted, it would still face an insurmountable difficulty in challenging the Board's conclusion that it did not suffer a "detriment" or that the disclosure was improper.

TAG. But competition in inspection efficiency, or more accurately inefficiency, is hardly the sort of competition the statute is designed to protect.[3]

■ Carribean also complains that it was denied its statutory procedural rights because the STB dismissed its complaint without allowing discovery. But 49 U.S.C. § 14701(b) allows the Board to "dismiss a complaint that it determines does not state reasonable grounds for investigation and action." Here, the Board thought that the issue raised by Caribbean was essentially a legal one and saw "no basis for going through discovery and protracted proceedings in order to permit [Caribbean] to pursue legal claims that will ultimately prove fruitless." As we have previously stated, "the conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision." *Trailways Lines, Inc. v. ICC*, 766 F.2d 1537, 1546 (D.C.Cir.1985). In this case, there is little dispute as to how TAG uses the information it receives from carriers; Caribbean here objects to the manner in which TAG readily acknowledges it uses the information. While discovery into TAG's operations might be useful to Caribbean's members for other reasons, we agree with the Board that discovery for the purpose of resolving petitioner's complaint would have not been worthwhile. *See id.* (discovery not required when seen by an agency as unlikely to affect its decision).

\* \* \* \*

Accordingly, Caribbean's petition for review is denied.

*So ordered.*

---

3. Indeed, if that is petitioner's injury, it is doubtful that it would have prudential standing; and it seems that it runs afoul of the court's chutzpah doctrine. *See Marks v. Commissioner*, 947 F.2d 983, 986 (D.C.Cir.1991) (fugitives from criminal prosecution argued that inadequate efforts were made to notify them of tax delinquency); *Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 & n. 5 (D.C.Cir.1991) (subcontractor asserted contractor was negligent for relying on subcontractor's advice).