UNITED TRANSPORTATION UNION--
ILLINOIS LEGISLATIVE
BOARD, Petitioner,

v.

SURFACE TRANSPORTATION
BOARD and United States of
America, Respondents.

No. 98–1278.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 4, 1999.

Decided May 7, 1999.

Gordon P. MacDougall argued the cause and filed the briefs for petitioner.

Louis Mackall, V, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, and Robert J. Wiggers, Attorneys, and Henri F. Rush, General Counsel, Surface Transportation Board.

Before: GINSBURG, HENDERSON, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Surface Transportation Board approved the application of the Chicago SouthShore & South Bend Railroad (CSS) to acquire operating rights over approximately nine miles of track owned by the Illinois Port District. Chicago Rail Link (CRL) also operates over that stretch of track. The United Transportation Union–Illinois, which represents both CSS and CRL employees, petitions for review of the STB's decision.

The Union argues that the Board applied the wrong section of the Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.* (1994), and that the Board should have conditioned its approval of the transaction upon the imposition of protective provisions for the benefit of the employees of CSS and CRL. For the reasons set out below, we deny the petition for review.

## I. Background

For several years CRL alone operated a rail service over and maintained the Port's track in the Lake Calumet area of Chicago. In October, 1994 the Port entered into a three-year agreement authorizing CSS also to operate trains on that track. (CRL would remain solely responsible for maintenance.)

CSS applied to the Interstate Commerce Commission for approval of this acquisition of operating rights under 49 U.S.C. § 10901 (1994), subsection (a)(3) of which provided: "A rail carrier ... subject to the jurisdiction of the [ICC] ... may ... acquire or operate an extended or additional railroad line" only if the ICC found that public convenience so required or permitted. The UTU opposed the application, contending that CSS's transaction with the Port was governed not by § 10901 but by § 11343 (1994), subsection (a) of which lists, among the "transactions involving carriers [that] ... may be carried out only with the approval and authorization of the Commission: ... (6) acquisition by a rail carrier of trackage rights over ... a railroad line ... operated by another rail carrier." If the ICC approved the transaction under § 11343, then it would have had to require the carriers "to provide a fair arrangement ... protective of the interest of employees who are affected by the transaction." § 11347 (1994). If it approved the transaction under § 10901, however, then it would have discretion whether to impose such employee protective conditions, *see* § 10901(e) (1994), and

as a matter of policy it would do so only upon a showing of "exceptional circumstances." *See Class Exemption for Acquisition & Operation of Rail Lines under 49 U.S.C. 10901,* 1 I.C.C.2d 810, 819 (1985), *aff'd sub nom., Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C.Cir. 1987) (table). The UTU sought protection for the employees of both CSS and CRL.

The ICC rejected the Union's petition and approved CSS's acquisition under § 10901, noting that the Commission's regulations "specifically state that [§ 10901] applies when an existing carrier seeks to operate a line owned by a noncarrier," such as the Port. The Commission then declined to exercise its discretion to impose employee protective conditions on the ground that the UTU had not shown that exceptional circumstances warranted such protection.

While the UTU's petition to reopen that decision was pending before the ICC, the Congress passed the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, which transferred jurisdiction over rail carriers to the STB as of January 1, 1996. A savings clause in the ICC–TA provides that it "shall not affect any proceedings ... pending before the [ICC] at the time this Act takes effect." *Id.* § 204(b)(1), 109 Stat. 941.

Accordingly, the Union's petition to reopen this proceeding was transferred to the STB, which, applying the law as it was prior to the ICC–TA, adhered to the decision of the ICC in all respects. The STB also determined that, if the UTU petitioned a court for review and the court remanded the case, then the Board on remand would be required to apply the Interstate Commerce Act as amended by the ICC–TA. The Board further noted that in the ICC–TA the Congress had limited the requirement that the Board impose employee protective conditions upon transactions under § 11343 (recodified at 49 U.S.C. § 11323) to those involving Class I or Class II carriers. *See* 49 U.S.C. § 11326(c). Finding that both CSS

and CRL were Class III carriers, the Board concluded that, even if a court agreed with the UTU that the Board should have evaluated the transaction between CSS and the Port under § 11343 rather than under § 10901, "neither employees of CSS nor employees of CRL would be entitled to protection."

## II. Analysis

In its petition for review the UTU argues that the decision of the Board was contrary to the plain meaning of § 11343. We review the Board's order under the deferential standard of the Administrative Procedure Act: we must uphold the decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see McCarty Farms, Inc. v. STB,* 158 F.3d 1294, 1300 (D.C.Cir.1998). We review the Board's interpretation of the statute it administers using the familiar two-step analysis of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Caribbean Shippers Ass'n v. STB,* 145 F.3d 1362, 1364 (D.C.Cir.1998).

### A. Standing

The Board contends that "[e]ven if UTU were able to establish that this case should be construed as a multi-carrier transaction involving CRL, no meaningful relief could be accorded [the UTU] on remand." Because this argument draws the Union's standing into question, we must determine whether the court has jurisdiction of the case before we may turn to the merits of the Union's petition for review. *See Skaggs v. Carle,* 110 F.3d 831, 834 (D.C.Cir.1997) ("to establish ... standing to sue under Article III of the Constitution, the appellant[ ] must show that ... the injury is likely to be redressed by a court decision in [its] favor"); *Steel Co. v. Citizens for Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s]

from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception' ").

We have previously held that a dispute over employee protective conditions is sufficient to confer standing upon the union that represents the affected employees. *See Brotherhood of Locomotive Eng'rs v. United States,* 101 F.3d 718, 724 (1996) (" '[T]he possibility' that one characterization of the transaction could lead to greater labor protection than another ... 'yields sufficient potential for greater protection to [the] employees to provide a justiciable injury' "). Accordingly, if the ICA as it was prior to the ICC–TA would arguably apply on remand, then the UTU has standing based upon its claim that the Board should have approved CSS's acquisition under § 11343, with its mandatory provision for employee protective conditions. The Board, however, argues that the ICC–TA, and not the ICA, clearly would apply on any remand; that the mandatory employee protection provisions in the ICC–TA are expressly made inapplicable to transactions involving only Class III carriers; and, therefore, that no matter how the transaction between CSS and the Port is characterized the UTU cannot get the relief it seeks. Consequently, the UTU's standing depends upon whether its interpretation of the ICC–TA, under which that statute either would not apply on remand or alternatively would not preclude the relief it seeks, is non-frivolous. *See Steel Co.,* 118 S.Ct. at 1019 & n.9 ("frivolous claims are themselves a jurisdictional defect"). Because we conclude that the UTU has standing even if the ICC–TA would apply on remand, we need not resolve the question whether the ICA would arguably apply on remand.

The UTU argues that nothing in the ICC–TA constrains the Board's discretion to impose employee protective conditions upon a transaction approved under § 11323. The Union first points to the command in 49 U.S.C. § 11324(c): the "Board shall approve and authorize a transaction [referred to in § 11323] when it finds the transaction is consistent with the public interest." The Union then directs our attention to *United States v. Lowden,* 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208 (1939), in which the Court held that the ICC's authority in the corresponding section of the Interstate Commerce Act to impose upon covered transactions such conditions as "will promote the public interest" invested the agency with the discretion to impose employee protective conditions. *Id.* at 232.

In the decision here under review, the STB did not address the scope of its discretion under § 11324(c); it held only that "neither employees of CSS nor employees of CRL would be entitled to protection" because both railroads are Class III carriers. Nor does the STB address this issue in its brief. Arguably, therefore, the STB still has discretion under § 11324(c), in approving a transaction under § 11323 involving only Class III carriers, to impose employee protective conditions.

Consequently, we cannot say that the UTU's interpretation of the statute is frivolous: the relief it seeks is not clearly precluded, and it is likely, not merely speculative, that with such relief its grievance would be redressed. *See Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 457–58 (D.C.Cir.1998) (possibility of remedy on remand sufficient to satisfy redressability element of standing). That possibility is enough to give the UTU standing to raise its claim that the transaction was misclassified.[*]

---

[*] After oral argument the STB belatedly brought to our attention its decision in *Genesee & Wyoming, Inc.,* STB Fin. Dkt. No. 32863, Oct. 1, 1997, *aff'd sub nom., International Bhd. of Locomotive Eng'rs v. STB,* 1998 WL 720670 (D.C.Cir. Sept.14, 1998). According to the Board, that decision "clearly state[s] that [the Board] has no discretion to impose labor protection for transactions under 49 U.S.C. 11323 involving only Class III carriers." As we read the decision, however, it holds merely that the reference in § 11326(c) to transactions "involving only Class III rail carriers" includes transactions in which a noncarrier,

## B. Classification of the Transaction

Both parties assume that we should review the STB's decision under the ICA as it was prior to the ICC–TA, and they cast their arguments accordingly. We shall take their dispute as they frame it, of course; we pause only to note that there is an issue lurking in the background.

The savings provisions of the ICC–TA distinguish between an "appeal" from an agency proceeding and a "suit" against the ICC. *See* ICC–TA §§ 204(b) & (c), 109 Stat. 941–42.[†] Without having engaged in any extended analysis of the savings provisions, heretofore we have consistently, with but one exception, treated petitions to review final orders of the ICC as "suits" within the meaning of § 204(c)(1). *See Grainbelt Corp. v. STB*, 109 F.3d 794, 796 n. 1 (1997); *Western Resources, Inc. v. STB*, 109 F.3d 782, 784 n. 1 (1997); *Consolidated Rail Corp. v. STB*, 93 F.3d 793, 794 (1996); *Burlington Northern R.R. Co. v. STB*, 75 F.3d 685, 688 (1996). *But see Western Coal Traffic League v. STB*, 169 F.3d 775, 778 n. 3 (1999) (treating petition for review as appeal from agency proceeding under § 204(b)(1)). Further, we have yet to analyze the question whether that section requires us to apply the ICC–TA to petitions for review filed after December 29, 1995. Indeed, we have been less than consistent in our approach. *See Grainbelt*, 109 F.3d at 796 n. 1 (not applying

ICC–TA to petition for review filed in January, 1996); *Western Resources*, 109 F.3d at 784 n. 2 (implying that ICC–TA might apply to petition for review filed in August, 1995); *Consolidated Rail*, 93 F.3d at 794 (applying pre-ICC–TA law in case consolidating four petitions for review filed by December, 1995); *Burlington Northern*, 75 F.3d at 692–93 (applying pre-ICC–TA law to petition for review filed in September, 1994). Even if the parties disagreed on which law is applicable here we would not have to resolve the issue, however, for there is no material difference between, on the one hand, §§ 10901 and 11343 of the ICA as they were prior to enactment of the ICC–TA, and on the other hand, §§ 10902 and 11323 as enacted in the ICC–TA.

■ To return to the case at hand, then, § 10901(a)(3) allows a rail carrier, with the ICC's approval, to "acquire or operate an extended or additional railroad line." The UTU argues that the transaction between CSS and the Port does not fit within that provision but instead comes within the literal terms of § 11343(a)(6): "acquisition by a rail carrier [namely, CSS] of trackage rights over ... a railroad line ... operated by another rail carrier [namely, CRL]." As the STB noted in its opinion, however, § 11343 is more plausibly interpreted as applying only to transactions between two or more carriers. Section 11343(a) begins

in addition to Class III rail carriers, is a party, as long as no Class I or Class II rail carrier is a party. The closest the decision comes to addressing the Board's discretion is a footnote explaining the decision of the Director to correct a notice of exemption to reflect the interpretation of § 11326(c) set out above. *See Genesee & Wyoming*, slip op. at 2 n.6 ("In correcting the earlier notice, the Director simply acted to make the notice conform with 49 U.S.C. 11326(c). Neither the Director nor the Board could exercise any discretion or make any different determination under the statute"). In any event, the *Genesee* decision plainly does not address the scope of the STB's discretion under § 11324(c).

† Section 204(b)(1) provides: "The provisions of this Act shall not affect any proceedings ...

pending before the [ICC on January 1, 1996].... Orders shall be issued in such proceedings [and] appeals shall be taken therefrom ... as if this Act had not been enacted...."

Section 204(c)(1) provides: "This Act shall not affect suits commenced before [December 29, 1995], except as provided in paragraphs (2) and (3). In all such suits, proceeding shall be had, appeals taken, and judgments rendered ... as if this Act had not been enacted."

Section 204(c)(3) provides: "If the court in a suit described in paragraph (1) remands a case to the Board ... subsequent proceedings related to such case shall proceed in accordance with applicable law and regulations as in effect at the time of such subsequent proceedings."

by referring to "[t]he following transactions involving carriers," and each of the six subsections that follow describes a transaction that necessarily involves multiple carriers.[‡] Indeed, in 1982 the ICC promulgated a regulation that reflected this very interpretation of § 11343. *See* 49 C.F.R. § 1150.1(a) ("Existing carriers require approval under section 10901 only to construct a new rail line or operate a line owned by a noncarrier, since acquisition by a carrier of an active rail line owned by a carrier is covered by 49 U.S.C. 11343"). In explaining this regulation, the ICC reasoned that "section 11343 is applicable only to acquisition[s] where both the buyer and the seller are carriers." *Application Procedures for a Certificate to Construct, Acquire or Operate Railroad Lines,* 365 I.C.C. 516, 518 (1982) (Notice of Final Rules). Moreover, this court upheld the ICC's reading of § 11343 as a provision applicable only to multiple-carrier transactions and called it "a reasoned and permissible effectuation of the statutory scheme." *Simmons v. ICC,* 829 F.2d 150, 157 (1987).

The only distinction between this case and *Simmons* is that here CSS acquired operating rights over track owned by a noncarrier, while in the earlier case a carrier acquired the underlying track from a noncarrier. The STB argues that this is a distinction without a difference because neither the statute nor the regulation differentiates in any way between operating rights and ownership. *See* § 10901(a)(3) (rail carrier "may . . . acquire or operate an . . . additional railroad line"); *see also* 49 C.F.R. § 1150.1(a) ("subpart governs applications [for the] . . . acquisition or operation of railroad lines"). Although the UTU attempts to invest the distinction with significance, as follows, we conclude that *Simmons* is controlling.

The Union first contends that this case involves a "relationship within § 11343(a)(6)" because CSS and CRL have each agreed with the Port to allocate maintenance expenses based upon their proportionate use of the track and because the two carriers must collaborate in order to avoid collisions. Relationships, however, are not the stuff of § 11343(a)(6). As the Board correctly points out, § 11343 "focuses on whether two or more carriers have been brought under common management or control through a transaction." Neither a maintenance agreement nor the coordination of schedules between two carriers is a control transaction, let alone a control transaction described in § 11343.

Second, the UTU argues that § 10901 and the regulations that implement it presuppose that for each rail line there is a single operator, not multiple "nonexclusive operators." As evidence, the Union cites 49 C.F.R. § 1150.3(c), which requires an applicant for approval under § 10901 to state "whether the rail line will be operated by [the] applicant. If not, the operator which has been selected must join in the application." *Id.* As we read this regulation, it means only that the agency would not have entertained an application (from the Port, for example) in which the proposed operator (here CSS) had not joined. The Union also points to 49 C.F.R. § 1150.31, which establishes procedures for the expedited approval of applications under § 10901 and "also includes":

(1) Acquisition by a noncarrier of rail property that would be operated by a third party;

(2) Operation by a new carrier of rail property acquired by a third party; [and]

[‡] *See* § 11343(a)(1) ("consolidation or merger . . . of at least 2 carriers"); § 11343(a)(2) ("a purchase . . . of another carrier by any number of carriers"); § 11343(a)(3) ("acquisition of control of a carrier by any number of carriers"); § 11343(a)(4) ("acquisition of control of at least 2 carriers by a person that is not a carrier"); § 11343(a)(5) ("acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers"); § 11343(a)(6) ("acquisition by a rail carrier of . . . joint ownership in . . . a railroad line . . . owned or operated by another rail carrier").

(3) A change in operators on the line....

Not only do the three listed transactions not preclude multiple operators, but the opening sentence of the regulation in question—which the Union neglects to quote—provides that it "applies to all acquisitions and operations under section 10901" as interpreted in 49 C.F.R. § 1150.1. And, as the Board notes, § 1150.1 distinguishes between single and multiple carrier transactions without regard to the number of carriers ultimately operating the track. In sum, we see nothing in the statute or in the regulations promulgated thereunder that confirms the UTU's reading of § 10901 or suggests a prohibition upon multiple carriers operating a single line.

Finally, the UTU maintains that the STB's position that "there is no meaningful distinction between operating and operating over" a line is arbitrary and capricious. This claim evinces a misunderstanding of the Board's decision. The Union had argued before the Board that § 10901 "distinguishes between operating and providing transportation over a line" and that § 10901 applies only to carriers that operate a line. In the UTU's parlance, CRL operated the track because it had the maintenance contract, while CSS merely operated over it. The Board rejected this distinction, noting that the Port had separated operation of the line from maintenance of the line and that CSS "is operating the Port track in the same manner as CRL." Therefore, the Board concluded that both CSS and CRL operated the track or, in other words, that "there is no meaningful distinction between [what the UTU described as] operating and operating over" a line.

The Board's decision was consistent with its regulations, which, as noted above, we have previously held reflect a reasonable interpretation of an ambiguous statute. *See Simmons,* 829 F.2d at 157. Therefore, the ICC and the STB properly processed CSS's acquisition of operating rights under § 10901.

 Further, the Board did not err in declining to exercise its discretionary power to impose labor protective conditions upon a transaction under § 10901. Recall that, as a matter of policy, the STB imposes such conditions only upon a showing of "exceptional circumstances." The UTU did not attempt to make a showing of exceptional circumstances before either agency, and it acknowledges in its brief to this court that exceptional circumstances "are not asserted in this proceeding."

### III. Conclusion

For the foregoing reasons, UTU's petition for review is

*Denied.*