**CREIGHTON LIMITED, Appellant,**

v.

**GOVERNMENT OF THE STATE OF QATAR, Appellee.**

**No. 98–7063.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1998.

Decided July 2, 1999.

Rehearing En Banc Denied Sept. 7, 1999.*

---

\* Circuit Judge Wald did not participate in this matter.

Joseph P. Hornyak argued the cause and filed the briefs for appellant.

Eugene D. Gulland argued the cause and filed the brief for appellee.

Before: GINSBURG, HENDERSON, and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Creighton Limited, a Cayman Islands corporation with offices in Tennessee, contracted with the Government of the State of Qatar to build a hospital in Doha, the Qatari capital. Following a dispute over its performance, Creighton obtained an arbitral award against Qatar from the International Chamber of Commerce in Paris. Creighton now seeks to enforce the award in the United States District Court for the District of Columbia. Qatar claims the court lacks subject matter jurisdiction over the action pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611, and lacks personal jurisdiction over Qatar pursuant to the Due Process Clause of the Fifth Amendment to the Constitution of the United States. We hold that the district court has subject matter jurisdiction but affirm its dismissal of Creighton's suit for lack of personal jurisdiction.

## I. Background

In the late 1970s the Government of Qatar decided to build a new hospital in Doha. Creighton obtained the necessary Qatari sponsor, submitted the low bid, and in 1982 contracted with Qatar to build the hospital. The contract required Creighton to obtain a performance bond from a Qatari issuer and to maintain an office in Qatar, to which notices under the contract would be sent. Qatar was to pay Creighton in Qatar, and in fact all payments were made there in Qatari riyals. The contract provided that it was to be performed and interpreted under Qatari law and that all disputes were to "be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce."

In 1986 Qatar expelled Creighton from the construction site for unsatisfactory performance. Creighton contested its expulsion by commencing arbitration before the ICC in 1987. Because the contract did not specify a place for arbitration, the ICC decided to conduct the arbitration in Paris. Qatar willingly participated in the arbitration, which resulted in an order for Qatar to pay Creighton damages, interest, and attorney's fees totaling over $8 million. Qatar then filed a court action in France to set aside the award as invalid under French law, which the Supreme Court of France ultimately rejected. Nonetheless, Creighton has been unable to enforce the award in France. It attempted to attach Qatari assets located there but the Superior Court of Paris held the particular assets in question were immune from attachment under French law. Creighton's appeal of that decision is now pending before the Supreme Court of France.

Meanwhile, Creighton filed this action seeking enforcement of the award in the United States District Court for the District of Columbia; Qatar moved to dismiss on a number of grounds. The district court granted the motion on the ground that it lacks personal jurisdiction over Qatar because Qatar does not have sufficient contact with the United States to make it amenable to suit here consistent with the due process requirement of the fifth amendment.

## II. Analysis

Qatar claims the district court lacks both subject matter jurisdiction over this action, pursuant to the Foreign Sovereign Immunities Act, and personal jurisdiction over Qatar, pursuant to the due process clause.

Under the FSIA, the district court has subject matter jurisdiction of a civil action against a foreign state only if "the foreign state is not entitled to immunity either under [the immunity provisions of the FSIA itself, 28 U.S.C. §§ 1605–1607] or under any applicable international agreement." 28 U.S.C. § 1330(a).

Creighton claims that by agreeing to arbitrate in France Qatar impliedly waived both its sovereign immunity, thereby conferring subject matter jurisdiction upon the court, *see id.* § 1605(a)(1) & (6), and its due process objection, thereby conferring personal jurisdiction upon the court. Alternatively, Creighton claims that Qatar's agreement to arbitrate in France confers subject matter jurisdiction, *see id.* § 1605(a)(6), and its contacts with the United States are sufficient to satisfy the constitutional requirements of personal jurisdiction. Although we hold below (in Part II.A.2.b) that the court has subject matter jurisdiction pursuant to § 1605(a)(6), we find it necessary also to discuss § 1605(a)(1) because one of Creighton's due process arguments (*see* Part II.B.1) presupposes that Qatar, by agreeing to arbitrate in France, waived its immunity pursuant to § 1605(a)(1). We cannot resolve that due process argument without addressing the claim about § 1605(a)(1) upon which it is predicated.

A. Subject Matter Jurisdiction

There are two prerequisites to the district court having subject matter jurisdiction over this case. First, there must be a basis upon which a court in the United States may enforce a foreign arbitral award; and second, Qatar must not enjoy sovereign immunity from such an enforcement action. We discuss each requirement separately.

1. The New York Convention

█ Both France and the United States, but not Qatar, are parties to the so-called New York Convention, a multilateral treaty providing for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, art. I.1, 21 U.S.T. 2517, *reprinted in* 9 U.S.C.A. § 201 (historical and statutory note). The U.S. legislation implementing the Convention declares that

[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States ... shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

9 U.S.C. § 203.

That the New York Convention applies to the arbitral award Creighton obtained against Qatar in France, and that the award is therefore enforceable in United States courts, is undisputed. *See Restatement (Third) of Foreign Relations Law* § 487 comment b (1987) ("the critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration"). If Qatar were a private party, then there could be no doubt about the subject matter jurisdiction of the district court; because it is a foreign state, however, we must consider the effect of the FSIA upon the court's power to hear this case.

2. Sovereign Immunity

█ The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). A foreign state is "presumptively immune from the jurisdiction of United States courts," *Saudi Arabia v. Nelson*, 507 U.S.

349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), that is, the state is immune unless the particular lawsuit comes within an exception in the FSIA. *See* 28 U.S.C. § 1604. Creighton claims that the exceptions for an implied waiver and for arbitration, *see id.* § 1605(a)(1), (6), apply to this case.

### a. Implied Waiver

 The former exception provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity ... by implication.

*Id.* § 1605(a)(1). Creighton claims that Qatar, by agreeing to arbitrate in France, implicitly waived its sovereign immunity in the United States for, by virtue of the New York Convention, Qatar was "on notice" that an arbitral award rendered in France would be enforceable in this country. Qatar responds that "the FSIA and decisions applying it make clear that a sovereign's agreement to arbitrate in a New York Convention state is not a waiver of immunity to suit in the U.S. unless the foreign sovereign is also party to the New York Convention."

The FSIA does not define an implied waiver. We have, however, followed the "virtually unanimous" precedents construing the implied waiver provision narrowly. *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1017 (2d Cir.1991). In particular, we have held that implicit in § 1605(a)(1) is the requirement that the foreign state have intended to waive its sovereign immunity. *See Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1174 (1994) ("[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit"); *Foremost-McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 444 (D.C.Cir.1990) ("courts rarely find that a nation has waived its sovereign immunity ... without

strong evidence that this is what the foreign state intended").

The closest Creighton comes to arguing that Qatar intended to waive its sovereign immunity is in pointing to this statement in the House Report accompanying the FSIA: "the courts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country." H.R.Rep. No. 94–1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617. Creighton claims Qatar's agreement to arbitrate in France should be deemed an implicit waiver of its sovereign immunity in U.S. courts. *Cf. id.* (explaining courts have also found such waivers "where a foreign state has agreed that the law of a particular country should govern a contract").

We follow the Second Circuit in rejecting such a broad reading of the "implicit waiver" exception.

[I]f the language of the legislative history [were] applied literally, a foreign government would be subject to the United States's jurisdiction simply because it agreed to have the contract governed by another country's laws, or agreed to arbitrate in a country other than itself, even though the agreement made no reference to the United States. Such an interpretation of § 1605(a)(1)'s "implicit waiver" exception would vastly increase the jurisdiction of the federal courts over matters involving sensitive foreign relations.

*Seetransport Wiking Trader v. Navimpex Centrala,* 989 F.2d 572, 577 (2d Cir.1993); *see also Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir. 1985) ("[M]ost courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States"); *Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1102 n. 13 (D.C.Cir.1982) (courts "have generally assumed ... that Congress did not endorse

the literal wording of the House Report"). Indeed, the intentionality "requirement is also reflected in the examples of implied waiver set forth in the legislative history of § 1605(a)(1), all of which arise either from the foreign state's agreement (to arbitration or to a particular choice of law) or from its filing a responsive pleading without raising the defense of sovereign immunity." *Princz*, 26 F.3d at 1174; *see also Shapiro*, 930 F.2d at 1017 (explaining that legislative history lists examples of implicit waiver "in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous"); *Maritime Int'l*, 693 F.2d at 1103 ("A key reason why pre-FSIA cases [referred to in the legislative history] found that an agreement to arbitrate in the United States waived immunity from suit was that such agreements could only be effective if deemed to contemplate a role for United States courts").

The Supreme Court has also read § 1605(a)(1) to require an intention to waive immunity in the United States, though concededly upon facts rather different from those present here. Argentina was sued in the United States for allegedly sinking a Liberian tanker owned by U.S. interests during the war between Great Britain and Argentina over the Falkland Islands. Although Argentina had signed international treaties setting forth substantive rules of conduct and stating that compensation would be paid for certain wrongs, the Court held "we [do not] see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." *Argentine Republic*, 488 U.S. at 442–43, 109 S.Ct. 683, 102 L.Ed.2d 818.

Creighton seeks support in three cases in which the court found an implied waiver where a foreign government had agreed (like Qatar) to arbitrate in the territory of a state that had signed the New York Convention. *See Seetransport*, 989 F.2d at 578–79; *M.B.L. Int'l Contractors v. Republic of Trinidad & Tobago*, 725 F.Supp. 52, 54–55 (D.D.C.1989); *Ipitrade Int'l S.A. v. Federal Republic of Nigeria*, 465 F.Supp. 824, 826 (D.D.C. 1978). In each of these cases, however, the defendant sovereign was (unlike Qatar) a signatory to the Convention. In *Seetransport* the Second Circuit reasoned, correctly we think, that "when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states." 989 F.2d at 578.

Qatar not having signed the Convention, we do not think that its agreement to arbitrate in a signatory country, without more, demonstrates the requisite intent to waive its sovereign immunity in the United States. As Creighton directs us to no other evidence of such an intent, we hold that § 1605(a)(1) does not confer subject matter jurisdiction upon the district court.

#### b. Arbitration

■ The Congress added the following exception to the FSIA in 1988:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case ... in which the action is brought ... to confirm an award made pursuant to ... an agreement to arbitrate, if ... the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards.

28 U.S.C. § 1605(a)(6). Qatar does not contest Creighton's assertion that because the New York Convention calls for enforcement of any arbitral award rendered within the jurisdiction of a signatory country, the quoted exception applies by its terms to this action. Indeed, it has been said with authority that the New York Convention "is exactly the sort of treaty Congress intended to include in the arbi-

tration exception." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir.1993); *see also Chromalloy Aeroservices v. Arab Republic of Egypt*, 939 F.Supp. 907, 909 (D.D.C.1996).

Qatar's sole defense is that application of the arbitral exception here would be impermissibly retroactive because it was added to the statute after the contract was signed, indeed after the Paris arbitration was commenced. In reply, Creighton suggests that because the FSIA is a jurisdictional statute, its application to events that occurred before it was enacted would not be retroactive, for the FSIA speaks not to the primary conduct of the parties but rather to the question of which tribunal may enforce the arbitral award.

As the Supreme Court has pointed out, it

> regularly applie[s] intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. ... Application of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case. Present law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties.

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). So it is in this case, for § 1605(a)(6) does not affect the contractual right of the parties to arbitration but only the tribunal that may hear a dispute concerning the enforcement of an arbitral award. *See McGee v. International Life Ins. Co.*, 355 U.S. 220, 224, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (holding long-arm statute enacted after parties entered into contract "did nothing more than to provide petitioner with a California forum to enforce whatever substantive rights she might have against respondent"). Under

established principles, therefore, application of § 1605(a)(6) is not retroactive, let alone impermissibly retroactive, and Qatar does not claim that a different result should obtain simply because a foreign state is affected by the change in a jurisdictional statute. *See Princz*, 26 F.3d at 1171 (postulating, though not deciding, that application of 1976 version of FSIA to acts committed before 1952 would not be retroactive because it "would not alter Germany's liability under the applicable substantive law in force at the time, i.e. it would just remove the bar of sovereign immunity to the plaintiff's vindicating his rights under that law"). Accordingly, we hold that the district court has subject matter jurisdiction over this case pursuant to the arbitration exception in § 1605(a)(6).

## B. Personal Jurisdiction

Not long ago we determined that the requirements of the FSIA for personal jurisdiction, *see* 28 U.S.C. § 1330(b),** "do not affect the constitutional *in personam* jurisdiction requirement [of] the due process clause of the Fifth Amendment." *Foremost-McKesson*, 905 F.2d at 442 n. 10; *see also Maritime Int'l*, 693 F.2d at 1105 n. 18 ("Of course, a finding of FSIA personal jurisdiction, which would rest in part on a finding of non-immunity, must comport with the demands of due process, and Congress intended that the Act satisfy those demands"); *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1028 (D.C.Cir. 1982) ("a statute cannot grant personal jurisdiction where the Constitution forbids it"). More recently, however, the Supreme Court questioned whether the personal jurisdiction requirement of the due process clause applies at all to foreign states, citing its prior holding that a State of the Union is not a "person" for purposes of that clause. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (citing

---

** "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction un- der subsection (a) where service has been made under section 1608 of this title."

*South Carolina v. Katzenbach,* 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). And the district court in turn has held that the requirement of personal jurisdiction does not apply to a foreign state. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 19–21 (D.D.C.1998).

■ Nonetheless, Creighton does not argue the point. Rather, Creighton claims that Qatar's entitlement to due process is satisfied because Qatar waived its objections to personal jurisdiction by agreeing to arbitrate in France or, in the alternative, because Qatar has the requisite minimum contacts with the United States. We take the dispute as the parties frame it, of course. *See United Transportation Union–Illinois Legislative Bd. v. Surface Transportation Board,* 175 F.3d 163, 1999 WL 279754, at *4 (D.C.Cir. May 7, 1999); *cf. Afram Export Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1362 (7th Cir.1985) ("Countless cases assume that foreign companies have all the rights of U.S. citizens to object to extraterritorial assertions of personal jurisdiction. The assumption has never to our knowledge actually been examined"). Accordingly, we proceed upon the unchallenged assumption that Qatar must be afforded the protection it claims under the due process clause.

### 1. Waiver

■ For a court to assert personal jurisdiction over a defendant not physically present in the forum, the defendant normally must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Because this "personal jurisdiction requirement recognizes and protects an individual liberty interest," however, like other individual rights it may be waived—for example, if the defendant agrees "to submit to the jurisdiction of a given court." *Insurance*

*Corp. of Ireland, Ltd. v. Compagnie des Bauxites,* 456 U.S. 694, 702, 704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

■ Relying upon the legislative history of the FSIA, Creighton claims that we need not engage in a separate due process analysis of Qatar's contacts with the United States because the Congress designed all the exceptions to sovereign immunity in the FSIA to comport with due process. The House Report explains:

> The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision [namely, 28 U.S.C. § 1605(a)(1)-(5) ]. *Cf. International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). ... Significantly, each of the immunity provisions in the bill ... requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction.

H.R.Rep. No. 94–1487, at 13, *reprinted in* 1976 U.S.C.C.A.N. at 6612. Creighton reasons that because Qatar impliedly waived its sovereign immunity under § 1605(a)(1), and alternatively because subject matter jurisdiction is proper under what it terms the "arbitral waiver" provision of § 1605(a)(6), Qatar has necessarily waived its objection to personal jurisdiction. The predicate for the first of these arguments we rejected when we held (in Part II.A.2.a) that Qatar did not impliedly waive its sovereign immunity under § 1605(a)(1). We now consider the second argument.

The House Report upon which Creighton relies accompanied the original 1976 legislation. As noted above, § 1605(a)(6) was added to the FSIA only in 1988. The 1976 legislative history, whatever it might

be worth as a guide to the original Act, has little if any bearing upon the later amendment. *Cf. Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 761 (2d Cir.1998) ("The elements of § 1605(a)(7) [enacted in 1996], unlike those of the commercial activities exception [in § 1605(a)(2), which was enacted in 1976], do not entail any finding of minimum contacts").

In any event, Creighton's argument proceeds from a mistaken premise, for unlike § 1605(a)(1), § 1605(a)(6) deals not with waiver but with forfeiture. *Cf. United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right"). Section 1605(a)(6) reflects the decision of the Congress to deny a foreign state immunity from suit in the United States if that state has agreed to arbitrate in any country that is party to a treaty (such as the New York Convention) calling for the enforcement of an arbitral award. Unlike subsection (a)(1), subsection (a)(6) contains no intentionality requirement. Therefore, although subsection (a)(6) confers subject matter jurisdiction upon the court, it does not follow that Qatar waived its objection to personal jurisdiction.

Although we have held that Qatar did not, by agreeing to arbitrate in France, waive its sovereign immunity under § 1605(a)(1), it is conceivable (though as we shall see, unlikely) that a different conclusion could follow with regard to whether Qatar waived its objection to personal jurisdiction under the due process clause. Creighton, however, has not cited, nor are we aware of, any authority for the proposition that an agreement to arbitrate in one forum constitutes a waiver of the right to challenge personal jurisdiction in another. On the contrary, the decisions of which we are aware have held that an implicit waiver of personal jurisdiction in a defendant's

agreement to litigate or to arbitrate in a particular jurisdiction is applicable only within that jurisdiction. *See Victory Transport Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 363 (2d Cir.1964) ("By agreeing to arbitrate in New York, where the United States Arbitration Act makes such agreements specifically enforceable, the [government of Spain] must be deemed to have consented to the jurisdiction of the court that could compel the arbitration proceeding in New York. To hold otherwise would be to render the arbitration clause a nullity"); *Microfibres, Inc. v. McDevitt–Askew*, 20 F.Supp.2d 316, 322 (D.R.I.1998) (holding agreement to litigate contractual disputes in Rhode Island implicitly waived right to challenge personal jurisdiction there); *Inso Corp. v. Dekotec Handelsges*, 999 F.Supp. 165, 167 (D.Mass. 1998) (holding "contractual stipulation to a particular forum implies consent to personal jurisdiction in that forum").

While the analogy is imperfect, we think it instructive to compare the New York Convention to the Full Faith and Credit Clause of the United States Constitution: "Full Faith and Credit shall be given in each State to the ... judicial Proceedings of every other State." Art. IV, § 1; *see also* 28 U.S.C. § 1738. It is implausible that a defendant in Connecticut who had agreed to arbitrate all disputes in New York, and thereby implicitly waived any objection to personal jurisdiction in a suit brought in New York to enforce the resulting arbitral award, also waived its objection to personal jurisdiction in such an action brought in California merely because the full faith and credit clause would make a valid New York judgment enforceable in the courts of California. Indeed, to accept such a bootstrap argument, under which the courts in every state would have personal jurisdiction over a defendant who had waived its objection in any one state, would in this context eviscerate an important limitation upon the principle of full faith and credit—that "a judgment need

not be honored if it was entered by a court that lacked personal ... jurisdiction." 18 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4467, at 634 (2d ed.1981); *see also Baker v. General Motors Corp.*, 522 U.S. 222, 233, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998); *Pennoyer v. Neff,* 95 U.S. 714, 729–33, 24 L.Ed. 565 (1877); *D'Arcy v. Ketchum,* 52 U.S. (11 How.) 165, 175–76, 13 L.Ed. 648 (1850). It seems to us likewise implausible that Qatar, by agreeing to arbitrate in France, a signatory to a treaty containing a similar reciprocal "recognition and enforcement" clause, should be deemed thereby to have waived its right to challenge personal jurisdiction in the United States.

For these reasons we hold that Qatar did not waive its objection to personal jurisdiction in the United States by agreeing to arbitrate in France.

### 2. Minimum Contacts

■■■ As noted above, when lack of personal jurisdiction is raised as a defense, due process requires that for the case to go forward the absent defendant must "have [had] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154, 90 L.Ed. 95. The defendant's contacts with the forum must be of a quality that it "should reasonably anticipate being haled into court" there. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).*

Creighton claims that Qatar has the requisite minimum contacts mainly because Qatar entered into a contract with a company based in the United States. Because that contract provided for ICC arbitration of all disputes and (according to Creighton) Qatari law does not recognize or enforce arbitral awards, "it was certainly foreseeable that Creighton would seek to enforce any award in its favor ... in the United States." In addition Creighton asserts that Qatar contacted Creighton in Tennessee during the negotiations leading to the contract in order to clarify an apparent error in Creighton's bid, Creighton signed a modification to the contract in Tennessee, and during construction Qatar telexed weekly status reports to Creighton's offices in Tennessee.

These contacts, however, do not demonstrate that Qatar purposefully availed itself of the laws of the United States and hence should reasonably have anticipated the risk of being haled into court here. Creighton's reliance upon the mere fact that Qatar contracted with a United States company (and the concomitant foreseeability that the company might try to bring suit in the United States) is misplaced, for the Supreme Court has squarely rejected the proposition that "an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum." *Burger King v. Rudzewicz,* 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis in original).

Our doubt about the adequacy of Qatar's contacts with the United States is increased when we consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479. As Qatar notes, the contract was offered, accepted, and performed in Qatar pursuant to a sponsorship arrangement between Creighton and

---

* We note that Qatar does not argue that due process requires that a foreign state have contacts with the forum state as opposed to the United States in general. *See SEC v. Vision Communications, Inc.,* 74 F.3d 287, 289 (D.C.Cir.1996) (suggesting the latter).

a Qatari contractor. The contract was made subject to the laws of Qatar, payment was made in Qatari riyals to Creighton's bank account in Qatar, and the alleged breach occurred in Qatar.

Overall, it seems Qatar's contacts with Creighton in Tennessee were necessitated by Creighton's decision to base itself there, and are not instances of Qatar purposefully availing itself of the benefits of the laws of Tennessee or of the United States. *See id.* at 475, 105 S.Ct. 2174 ("Th[e] purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person"). As we explained in an analogous—indeed, controlling—case, Creighton

> seems to confuse a distant purchaser "reaching out" to a seller in the forum state with a seller "reaching out" to a distant state in order to do business there. At least if it circulates its wares there, the seller purposefully avails itself of forum state law. By contrast, a purchaser who selects an out-of-state seller's goods or services based on their economic merit does not thereby purposefully avail itself of the seller's state law, and does not merely by purchasing from the seller submit to the laws of the jurisdiction in which the seller is located or from which it ships merchandise. Of course, a seller suing in its home state might argue that an out-of-state buyer has availed itself of that forum's laws in the sense that the buyer typically could have sued the seller in the forum state for breach of contract had the need arisen. In light of *Burger King*, however, this contingent type of "contact" is plainly not enough, as it would alone and automatically extend personal jurisdiction over all buyers in interstate contract actions, without regard to the parties' actual course of dealing and its relation to the forum.

*Health Communications, Inc. v. Mariner Corp.*, 860 F.2d 460, 464–65 (D.C.Cir.1988).

We therefore conclude that Qatar lacks the minimum contacts with the United States that would make it amenable to suit here consistent with due process.

### III. Conclusion

For the foregoing reasons, we hold that the district court had subject matter jurisdiction over this suit but lacked personal jurisdiction over Qatar. The judgment of the district court is therefore

*Affirmed.*