S & DAVIS INTERNATIONAL, INC., Plaintiff-Appellee,

v.

YEMEN, THE REPUBLIC OF, Ministry of Supply and Trade, Defendants-Appellants.

No. 99-10880.

United States Court of Appeals,

Eleventh Circuit.

July 21, 2000.

Appeal from the United States District Court for the Northern District of Alabama. (No. 98-03141-CV-J-NW), Inge P. Johnson, Judge.

Before EDMONDSON, HULL and WOOD[*], Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge:

S & Davis International, Inc. ("S & Davis") filed suit in the Northern District of Alabama to enforce

an arbitration award against the General Corporation for Foreign Trade and Grains ("General Corporation")

of Yemen. The suit arose from a breach of contract dispute. S & Davis also named the Ministry of Supply

& Trade (the "Ministry") and The Republic of Yemen as defendants, asserting that the General Corporation

was controlled by the government. The Ministry filed a motion to dismiss, claiming immunity under the

Foreign Sovereign Immunities Act of 1976 ("FSIA"). The district court held there was sufficient subject

matter jurisdiction and personal jurisdiction to proceed. The Ministry appeals. The district court's

interlocutory order denying immunity is reviewable under 28 U.S.C. § 1291 and the "collateral order

doctrine" established in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93

L.Ed. 1528 (1949). We affirm. Due to the fact that the district court order did not contain any findings of

fact and conclusions of law, we must include greater detail in our analysis for clarity on the issues.

## I. FACTS

On May 14, 1996, the General Corporation, a Yemeni corporation, executed a contract with S &

Davis, an Alabama corporation, to purchase 300,000 metric tons of wheat at a price of $274.88 per ton. The

---

[*]Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

contract was prepared "according to the instructions of the Ministry of Supply & Trade," and "[a]ll aspects of the contract were reportedly being discussed with the Minister of Supply who appeared to [be] the principal in the transaction." Affidavit of Roy David, president and CEO of S & Davis. In addition to the signatures of the two named parties, A.M. Ali Othman, the Minister of Supply & Trade of Yemen, also signed the contract, indicating approval by the Ministry as required under Yemeni law.

The contract specified U.S. wheat No. 2 or better with point of origin from the U.S., Canada, Australia, South Africa, or Argentina. The wheat was to be shipped from Portland, Oregon and delivered to Yemen, with freight charges calculated from Portland. The purchase price was to be paid with a letter of credit issued by the Bank of Yemen with confirmation by a "U.S.A. prime bank."[1]

The contract was negotiated and signed in Yemen. However, the contract contained an arbitration agreement providing that any dispute was to be arbitrated by the Grain and Feed Trade Association ("GAFTA") in London, England.

On May 28, 1996, the General Corporation requested the name of S & Davis's appointed bank where the letter of credit was to be opened.[2] S & Davis named Citizen's Bank in New York. On June 6, the General Corporation faxed S & Davis stating that because prices in the international wheat market had declined substantially, this had caused a delay in opening the letter of credit. The fax also asked S & Davis to discount the price by $10.00 per ton "in order to go ahead with final steps for start of implementation of the Contract."[3]

On June 18, the Central Bank of Yemen requested a bank reference for S & Davis in order to issue the letter of credit. On June 19, the Central Bank acknowledged receipt of a positive reference from Citizen's

---

[1] This description is taken directly from the contract. However, there is no recognized, accepted definition for the term "prime bank."

[2] Due to the fact that not all of the original documents have been included in the district court record, some of the specifics concerning the letter of credit are taken from Section 2, The Facts, of the GAFTA Appeal Award No. 3751, Award of Arbitration No. 12109, June 5, 1998. While these facts were not contested by either party, we would remind both parties that it is always more reliable to include direct evidence to support any statements of fact.

[3] It is not clear from the record or the briefs whether S & Davis refused or agreed to the discount.

2

Bank and instructed sellers to send a copy to the General Corporation's U.S. bank, the Arab American Bank in New York. On July 2, 1996, in response to inquiries by S & Davis, the United States Embassy in Yemen advised the company that the General Corporation was a government parastatal[4] which is required to finance its activities through the Central Bank of Yemen.

S & Davis provided a copy of a letter from A.M. Ali Othman, the Minister of Supply & Trade of the Republic of Yemen (the same Minister who had signed the contract), addressed to the General Corporation, dated July, 10, 1996, advising the company that the Minister had received information that S & Davis was "not internationally famous and, as such, it is difficult to have confidence in it." The letter stated, "We have previously directed you to terminate the contract ..." and again repeated, "we gave our instruction to terminate the contract...."

On September 14, the Embassy notified S & Davis that efforts to convince the Governor of the Central Bank of Yemen to open a letter of credit had failed. The General Corporation admits it was not able to obtain a letter of credit as required in the contract. After additional attempts through various political and diplomatic channels to open a letter of credit, on January 2, 1997, S & Davis declared the General Corporation had breached the contract and initiated GAFTA arbitration in London. Both parties agree that S & Davis had never purchased any wheat under the contract.

S & Davis sought damages against both the General Corporation and the Ministry of Trade, asserting that the General Corporation was not an independent organization with authority to contract. S & Davis maintains that the Ministry of Supply & Trade was a principal in the transaction, that it was the alter ego of the General Corporation, that it was in privity with the General Corporation and that through its interference it caused the breach of contract. S & Davis submitted an affidavit from a Yemeni solicitor, "by education, training and profession, ... an expert in the laws of the Republic of Yemen," who stated, "[t]he Public Corporations established under the caption law bear no semblance to western business corporations. All the

---

[4]A company working with the government in an unofficial capacity. Random House Dictionary of the English Language 1409 (2d ed.1987).

Yemeni Corporations, including the Public Corporation for Foreign Trade and Grains, are wholly owned by the Government of Yemen."

As further evidence, S & Davis asserts that the General Corporation is under the Ministry's control according to the Presidential Decree Issuing Act No. 35 for the Year 1991 concerning the Public Authorities, Establishments and Companies. S & Davis maintains that the General Corporation is a "public establishment" which provides services that are related to the production of goods and is completely owned by the State as indicated in the Decree. The Ministry maintains that the General Corporation is a "public company" which, under Decree No. 35, is owned by two or more public entities. However, neither party provided any evidence as to the specific type of company the General Corporation is or papers of incorporation indicating the exact status of the General Corporation.

The original GAFTA panel held that the General Corporation breached the contract by failing to open a letter of credit but concluded that S & Davis had not shown entitlement to any damages. It also held that the General Corporation was a separate entity from that of the Ministry, and, therefore, the Ministry was not liable. The appellate arbitration panel affirmed the finding of a breach of contract but awarded S & Davis approximately $17 million in damages against the General Corporation. The amount was based on the difference between the contract price of $274.88 per ton and the value at the time of the breach, $217.18 per ton, estimating the cost of freight from Portland to Yemen, financing costs, and other costs for seller's performance and subtracting those total costs from the contract price.

On December 18, 1998, S & Davis filed this suit in federal district court to enforce the arbitration award, in addition to a claim for breach of contract and enforcement of the arbitration award against the Republic of Yemen asserting that the General Corporation is a political subdivision of the Republic, and an alternative claim for tortious interference with contractual relations against the Ministry of Supply & Trade for the amount of the arbitration award. The Ministry filed a motion to dismiss under Fed.R.Civ.Proc. 12(b)(1), lack of subject matter jurisdiction, 12(b)(2), lack of personal jurisdiction, and 12(b)(5), insufficient

4

service of process. The Ministry claimed immunity under the FSIA, as a political subdivision of The Republic of Yemen.

S & Davis asserted that subject matter jurisdiction was allowed under the FSIA and the Convention on the Recognition and Enforcement of Foreign Arbitration Awards, 9 U.S.C. § 201 *et seq.* The district court held an oral hearing and on April 22, 1999, denied the Ministry's motion on all grounds. The Ministry timely filed a notice of appeal.

## II. ANALYSIS

*A.      Appellate Jurisdiction*

This court has jurisdiction over interlocutory orders denying claims of sovereign immunity under the FSIA. *Honduras Aircraft Registry v. Government of Honduras,* 129 F.3d 543, 545 (11th Cir.1997) (citation omitted).

The denial of a motion to dismiss for lack of personal jurisdiction is not, in itself, immediately appealable under the "collateral order doctrine" established in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Van Cauwenberghe v. Biard,* 486 U.S. 517, 526-27, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 756 (2d Cir.1998). We may, however, elect to exercise our "pendent appellate jurisdiction" if the personal jurisdiction issue is "inextricably intertwined" with an issue that is properly before this Court on interlocutory appeal. *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). This interlocutory appeal involves the denial of sovereign immunity based on the "commercial activity exception" to sovereign immunity which has a "direct effects" component. *See* 28 U.S.C. § 1605(a)(2). The "direct effects" component of the commercial activity exception to sovereign immunity is inextricably intertwined with the "minimum contacts" component of the personal jurisdiction issue making "pendent appellate jurisdiction" proper in this case. *See Rein,* 162 F.3d at 760 (discussing *Hanil Bank v. PT. Bank Negara Indonesia, (Persero),* 148 F.3d 127 (2d Cir.1998), and stating "[t]he finding of subject matter jurisdiction

5

under the commercial activities exception also entailed a finding of minimum contacts, ... [and] the issues of subject matter jurisdiction and personal jurisdiction were inextricably intertwined"); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020 (D.C.Cir.1997) (exercising pendent appellate jurisdiction over personal jurisdiction issue on interlocutory review of denial of immunity under the FSIA).

Because we find the Ministry is not entitled to sovereign immunity and that there is both subject matter and personal jurisdiction under the FSIA, we need not address the pendent jurisdiction issue concerning the alternative claim of tortious interference.

B.      *Standard of Review*

On appeal from the district court's denial of a motion to dismiss, we construe the complaint in the light most favorable to plaintiffs. *Honduras Aircraft,* 129 F.3d at 545. "We will accept as true the complaint's well pleaded facts, even if disputed, but not its conclusions." *Id.* (citing *Saudi Arabia v. Nelson,* 507 U.S. 349, 351, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) and *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

We review the denial of appellant's motion to dismiss *de novo* as to the law, *Mutual Assurance, Inc. v. United States,* 56 F.3d 1353 (11th Cir.1995), but we apply the clear error standard to any findings of fact. *Honduras Aircraft,* 129 F.3d at 546 (citing *Brown v. Valmet-Appleton,* 77 F.3d 860 (5th Cir.1996)).

C.      *Legal Status of the General Corporation*

The General Corporation has admitted that it "is an 'agency or instrumentality' of The Republic of Yemen." The General Corporation for Foreign Trade and Grains' Motion to Dismiss, May 10, 1999, at 12. The Ministry now denies this relationship. There exists an "intramural" dispute about the status of the General Corporation. For the purposes of this case, based on all the other evidence in the record, it would seem the General Corporation was correct in determining its own status. What those two parties may now internally decide among themselves about their relationship is irrelevant to this case.

6

However, because this admission comes from the General Corporation's motion to dismiss (not the Ministry's motion to dismiss) and because "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626-27, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("*Bancec* "), we delve further to determine whether the General Corporation is an agency of the Ministry, which is admittedly a political subdivision of The Republic of Yemen. The presumption of separate legal status may be overcome in two ways, (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," *id.* at 629, 103 S.Ct. 2591 (citation omitted), or (2) where recognition of the instrumentality as an entity separate from the state "would work fraud or injustice." *Id.* (citation omitted). S & Davis argues the Ministry (and therefore The Republic, as the Ministry is a political subdivision of The Republic) is amenable to suit under both exceptions.

"Where jurisdiction depends on an allegation that the particular defendant was an agent of the sovereign, the plaintiff bears the burden of proving this relationship." *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2$^d$ 528, 533-34 (5th Cir.1992) (citations omitted). In applying the agency exception to the rule of sovereign immunity, how much control the sovereign exercised over the instrumentality is reviewed. *Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843, 848 (D.C.Cir.2000) (citation omitted). "[C]ontrol is relevant when the sovereign exercises its control in such a way as to make the instrumentality its agent; in that case control renders the sovereign amenable to suit under ordinary agency principles." *Id.* at 849. "[A] sovereign need not exercise complete dominion over an instrumentality—to the point of stripping it of any meaningful separate identity—in order to establish a relationship of principal and agent." *Id.*

Particularly helpful in this instance is the basic criteria to determine a principal/agency relationship discussed in *Transamerica.*

> At a minimum, however, we can confidently state that the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf,

7

the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

200 F.3d at 849 (citation omitted).

Here the General Corporation presents itself as having the authority to purchase a government subsidized commodity. The Ministry provided a declaration which stated that it "oversees the social and economic development of Yemen ... regulating and monitoring domestic and foreign trade." S & Davis presented evidence that the Ministry, by and through the same minister who signed approving the contract, gave direct orders to terminate the contract. S & Davis also provided an affidavit from a Yemeni corporate lawyer stating the General Corporation was "wholly owned by the Government of Yemen."[5] Ultimately, the General Corporation failed to perform its part of the contract, that of opening the letter of credit, and breached the contract.

The Ministry, while asserting the General Corporation's autonomy, fails to provide any evidence of an independent entity, such as papers of incorporation and corporate structure, whether there is a board of directors or stock ownership, whether or not all employees are public servants, whether the corporation maintains financial accounts in its own name, or whether it owns any assets in its own name-all allegations in the complaint which S & Davis states do not exist, therefore rendering the General Corporation a mere instrumentality of the Ministry. By issuing direct orders to terminate the contract, the sovereign became more of a managing partner over its "agency or instrumentality." *See Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 695-96, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (citing *Bank of United States v.*

---

[5]Presidential Decree Issuing Act No. 35 does indicate that the government has more than a mere regulatory role in the affairs of public authorities, public establishments, and public companies. In addition, although the Republican Resolution No. 77 of 1996, which S & Davis submitted with its brief, presented evidence that the General Corporation came under the direct control of the Minister of Supply & Trade, it may not be considered as it was not part of the district court's record. *See Wilson v. Apfel,* 179 F.3d 1276, 1278 (11th Cir.1999) ("new evidence is not properly before the [appellate] court [when] it is merely attached as an appendix to [appellant]'s brief"); *see also Cherry v. Heckler,* 760 F.2d 1186, 1193-94 (11th Cir.1985) (holding that court's review is limited to the certified record).

8

*Planters' Bank of Georgia,* 9 Wheat. 904, 22 U.S. 904, 907, 6 L.Ed. 244 (1824)) ("when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted.") The Ministry has not sufficiently rebutted S & Davis's proof to persuade us that the General Corporation is a separate, independent entity. Therefore, we need not address the "fraud or injustice" exception nor the alter ego theory argued by S & Davis.

D.      *Subject Matter Jurisdiction*

To establish subject matter jurisdiction under the FSIA, a plaintiff must overcome the presumption that the foreign state is immune from suit in the United States' courts. *See* 28 U.S.C. § 1604 (1988); *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The FSIA includes agents or instrumentalities of a foreign state within the definition of "foreign state."[6]

In order to overcome the presumption of immunity, a plaintiff must prove that the conduct which forms the basis of its complaint falls within one of the statutorily defined exceptions. *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 610-11, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); 28 U.S.C. § 1604. Once a party offers evidence that an FSIA exception to immunity applies, the party claiming immunity bears the

_____

[6]28 U.S.C. § 1603(a), (b)(1), (b)(2) provide:

> (a) A "foreign state" ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

> (b) An "agency or instrumentality of a foreign state" means any entity—

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof....

burden of proving by a preponderance of the evidence that the exception does not apply. *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.,* 179 F.3d 1279, 1290 (11th Cir.1999) (citations omitted).

S & Davis claims that the Ministry is subject to jurisdiction pursuant to exceptions set forth in § 1605 of the FSIA; the waiver exception, 28 U.S.C. § 1605(a)(1), the arbitration exception[7] under § 1605(a)(6)(B),[8] and the commercial activity exception, 28 U.S.C. § 1605(a)(2).[9]

*1.      Waiver Exception*

A waiver of immunity may be explicit or by implication. S & Davis asserts that by agreeing to arbitrate pursuant to the rules of GAFTA in London, the Ministry, through the General Corporation, impliedly waived its sovereign immunity. S & Davis points to the legislative history of § 1605(a)(1), which states,

---

[7]The Ministry argues that the arbitration exception under § 1605(a)(6)(B) was not presented to the district court and therefore may not be considered on appeal. Although S & Davis failed to specifically cite to § 1605(a)(6)(B), it clearly states jurisdiction is pursuant to the FSIA, 28 U.S.C. § 1602 *et seq.,* and the Convention on the Recognition and Enforcement of Foreign Arbitration Awards, 9 U.S.C. § 201 *et seq.,* in both the original complaint and its response to the motion to dismiss.

[8]Congress added the following exception to the FSIA in 1988:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> (6) in which the action is brought ... to confirm an award made pursuant to such an agreement to arbitrate, if ... (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards....

28 U.S.C. § 1605(a)(6).

[9]The relevant portions of section 1605(a) are as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—...
>
> (1) in which the foreign state has waived its immunity either explicitly or by implication ...;
>
> (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign states elsewhere and that act causes a direct effect in the United States....

10

"with respect to implicit waivers, the courts have found such waivers in cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract." H.R.Rep. No. 1487, 94th CONG., 2D SESS. at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617.

As provided for in the contract, the parties submitted their dispute to arbitration before GAFTA. S & Davis now seeks to have the arbitral award issued by GAFTA recognized and enforced in the courts of the United States, pursuant to the Convention on the Recognition and Enforcement of Arbitral Awards (the "Convention"), opened for signature June 10, 1958, Art. I.1, 21 U.S.T. 2517, reprinted in 9 U.S.C. § 201. The Convention provides that "it shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought," 9 U.S.C. § 201, Art. I, and that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon...." *Id.* Art. III. Therefore, when a country becomes a signatory to the Convention, by the provisions of the Convention, the signatory State must have contemplated enforcement actions in other signatory states.

Most courts have determined that the implied waiver provision of § 1605(a)(1) must be construed narrowly. *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1017 (2d Cir.1991) (listing cases). Interpreting § 1605(a)(1), the Supreme Court held "we [do not] see how a foreign state can waive its immunity under § 1605(a)(1) by signing an international agreement that contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States." A*rgentine Republic,* 488 U.S. at 442-43, 109 S.Ct. 683.

In this case, although the United States and England are signatories to the Convention, The Republic of Yemen is not. The Ministry argues that a sovereign's agreement to arbitrate in a Convention State is not a waiver of immunity to suit in the U.S. unless the foreign sovereign is also a party to the Convention.

11

A similar situation is found in *Creighton Ltd. v. Government of the State of Qatar,* 181 F.3d 118 (D.C.Cir.1999). Creighton, a Cayman Islands' corporation with offices in Tennessee, contracted with the government of Qatar to build a hospital in Qatar. *Id.* at 120. Following a dispute over its performance, Creighton obtained an arbitral award against Qatar from the International Chamber of Commerce in Paris and then sought to enforce the award in the district court for the District of Columbia. *Id.* Due to the fact that Qatar was not a signatory to the Convention, the D.C. Circuit rejected a broad reading of the implicit waiver section that would allow waiver where the defendant sovereign is not a signatory to the Convention, finding that Qatar's "agreement to arbitrate in a signatory country, without more, [did not] demonstrate[ ] the requisite intent to waive its sovereign immunity in the United States." *Id.* at 123. We agree that there was no waiver of sovereign immunity.

2.      *Arbitration Exception*

However, the court in *Creighton* found jurisdiction under the arbitration exception in 28 U.S.C. § 1605(a)(6)(B), stating that "the New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception." 181 F.3d at 123 (internal quotations and citations omitted); *see also Matter of Chromalloy Aeroservices (Arab Republic),* 939 F.Supp. 907 (D.D.C.1996). As the court in *Creighton* noted, "[Section] 1605(a)(6) does not affect the contractual right of the parties to arbitration but only the tribunal that may hear a dispute concerning the enforcement of an arbitral award." 181 F.3d at 124 (citing *McGee v. International Life Ins. Co.,* 355 U.S. 220, 224, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

The Ministry contends that because it was not a party to the contract, it is not subject to the arbitration agreement or award. While it is true that in *Creighton* Qatar was a direct party to the contract, given our determination that there was sufficient evidence to show the General Corporation is an agency or instrumentality under the control of the Ministry, we find that the district court has subject matter jurisdiction pursuant to the arbitration exception under § 1605(a)(6)(B), where a foreign state has no immunity from a

12

proceeding to confirm an award that "may be governed by a treaty ... calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6)(B).[10]

3.      *Commercial Activity Exception*

While we need not establish jurisdiction under the commercial activities exception, it is clear from a reading of the legislative history of the FSIA that the activity here was commercial under 28 U.S.C. § 1605(a)(2). At hearings prior to the passage of the FSIA, regarding § 1605(d),[11] which defines commercial activity, one of the drafters of the FSIA stated that, "This would mean, for example, that a foreign state's purchase of grain from a private dealer would always be regarded as commercial." Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 27 (1976) (testimony of Monroe Leigh, Legal Adviser, Department of State); *see also* H.R. Rep. 94-1487 at 16-17, *reprinted in* 1976 U.S.C.C.A.N. at 6615 (stating "import-export transactions involving sales to, or purchases from, concerns in the United States" are included within the conduct of the first clause of § 1605(a)(2) and defining commercial activity under § 1603(d) to include "a single contract, if of the same character as a contract which might be made by a private person"). In determining that a letter of credit was a sufficiently direct effect in the United States, this circuit held that a "letter of credit arrangement-which was structured according to the wishes of the appellants-extends into [the United States], and the appellants' demands thus have significant, foreseeable financial consequences here." *Harris Corp. v. National Iranian Radio & Television,* 691 F.2d 1344, 1351 (11th Cir.1982); *see also Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex*

---

[10]Neither party disputes the fact that the petition for enforcement was filed within the three year period after an award is made, as required by 9 U.S.C. § 207. Nor does the Ministry contest the validity of the award or argue to vacate the award under 9 U.S.C. § 10.

[11]Section 1603 "Definitions" states that:

> (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

*Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993) (finding subject matter and personal jurisdiction under FSIA where contract was never performed).

We are not persuaded by the Ministry's argument that this case is the same as *MOL, Inc. v. Peoples Republic of Bangladesh,* 736 F.2d 1326 (9th Cir.1984), where the Bangladesh Ministry of Agriculture granted a ten-year license to MOL, an Oregon corporation, to export rhesus monkeys. The Ninth Circuit found this license "was not just a contract for trade of monkeys." *Id.* at 1329. Unlike *MOL,* the contract between S & Davis and the General Corporation *was* just a contract and the Ministry was more involved than a mere regulator, whose directives, not based upon regulatory reasons, controlled the General Corporation's actions. This was a commercial activity exception.

E.      *Personal Jurisdiction*

In reviewing whether or not the district court has personal jurisdiction over the defendant, we are guided by the following standard as was the Second Circuit in *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993).

> The plaintiff bears the burden of establishing personal jurisdiction over the defendant. Prior to trial, however, when a motion to dismiss for lack of jurisdiction is decided on the bases of affidavits and other written materials, the plaintiff need only make a prima facie showing. The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.

*Taylor v. Phelan,* 912 F.2d 429, 431 (10th Cir.1990) (per curiam) (citation omitted).

The FSIA provides that "district courts shall have original jurisdiction ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title...." 28 U.S.C. § 1330(a). Also under the FSIA, "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." *Id.* at § 1330(b). The 1976 House Report

14

concerning the passage of the FSIA states that "this bill would for the first time in U.S. law, provide a statutory procedure for making service upon, and obtaining in personam jurisdiction over, a foreign state." H.R. Rep. 94-1487 at 8, *reprinted in* 1976 U.S.C.C.A.N. at 6606. There is no language in the House Report, either expressly or impliedly, which would grant a liberty interest for the purposes of substantive due process analysis. In addition, particularly applicable to this case, the House Report states that the FSIA was specifically meant "to provide the judgment creditor some remedy if, after a reasonable period, a foreign state or its enterprise failed to satisfy a final judgment." H.R. Rep. 94-1487 at 8, *reprinted at* 1976 U.S.C.C.A.N. at 6606. Both parties agree that proper service has been made.[12] The parties agreed to arbitration, a final award was determined, and the defendants have failed to satisfy that award. Therefore, under the FSIA, personal jurisdiction exists.

The Ministry argues that personal jurisdiction here does not satisfy the due process clause of the Fifth Amendment. S & Davis asserts that under *Weltover,* a foreign state, or its instrumentality, is not a person for the purposes of a constitutional due process analysis. *Weltover,* 504 U.S. at 619, 112 S.Ct. 2160 ("[a]ssuming, without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," but citing *South Carolina v. Katzenbach,* 383 U.S. 301, 323-24, 86 S.Ct. 803, 15 L.Ed.2d 769 (finding States of the Union are not "persons" for purposes of the Due Process Clause)). We do not need to determine the precise constitutional status of a foreign sovereign because we find that the due process requirements have been met in this case. *See Hanil Bank v. PT. Bank Negara Indonesia, (Persero),* 148 F.3d 127, 134 (2d Cir.1998).

To determine whether the exercise of *in personam* jurisdiction is consistent with due process, the defendant normally must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotations and citations omitted).

---

[12]According to the Ministry's counsel at the time of oral argument, service had also been effected on both The Republic of Yemen and the General Corporation. This is confirmed by the district court docket.

However, the Court rejected a rigid formula for determining the contacts necessary to satisfy due process.
*Id.*

In general, the majority of cases brought under the FSIA involve commercial activity, which requires an evaluation of the activity's effects in the United States, *see* 28 U.S.C. § 1605(a)(2), similar to a "minimum contacts" analysis. The "direct effects" language of § 1605(a)(2) closely resembles the "minimum contacts" language of constitutional due process and these two analyses have overlapped. *See Weltover,* 504 U.S. at 619-20, 112 S.Ct. 2160; *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, at 1545 (11th Cir.1993). In determining what constitutes a direct effect, the Court in *Weltover* stated that an effect is direct if it occurs "as an immediate consequence of the defendant's activity." 504 U.S. at 618, 112 S.Ct. 2160 (internal quotations and citation omitted). Under the facts in *Weltover,* the Court held that "money that was supposed to have been delivered to a New York bank for deposit [which] was not forthcoming," constituted a direct effect. *Id.* at 619, 112 S.Ct. 2160. *See also Hanil Bank v. PT. Bank Negara Indonesia, (Persero),* 148 F.3d 127, 133 (2d Cir.1998) ("The failure of money to reach plaintiff's New York bank account was an immediate consequence of defendant BNI's actions in Indonesia."); *Voest-Alpine Trading USA Corp. v. Bank of China,* 142 F. 3d 887, 896 (5th Cir.1998) ("Voest-Alpine, an American corporation, incurred a nontrivial financial loss in the United States as a direct result of the Bank of China's failure to pay on a letter of credit it issued."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981) (holding that financial loss to an American corporation from problem with single shipment of rice to Nigeria sufficiently "direct" to support jurisdiction).

In addition to the direct effect contact, other evidence supports the sufficiency of minimum contacts. The contract specified that S & Davis was to designate a United States bank to receive the letter of credit. *See Weltover,* 504 U.S. at 619, 112 S.Ct. 2160. S & Davis named Citizen's Bank in New York. The Central Bank in Yemen was instructed to send of copy of S & Davis's bank reference to the General Corporation's bank, the Arab American Bank in New York. Although the contract stated that the origin of the wheat could

16

have been the U.S., Canada, Australia, South Africa, or Argentina, it allowed S & Davis to designate the point of departure for shipping to Yemen and S & Davis selected Portland, Oregon. *See Hanil Bank,* 148 F.3d at 134.

Analysis of the due process requirement also focuses on the evaluation of fair play and substantial justice. *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154. The defendants contractually agreed to arbitration, thereby binding themselves to the outcome of that arbitration. An arbitration award was issued but no performance was forthcoming on the defendant's part. It is not unreasonable that a United States corporation, following a foreign defendant's failure to open a letter of credit in the U.S., and after nonpayment of an arbitration award, should seek enforcement of the judgment in a United States' court. In fact, it is only "fair and just" to seek enforcement of the outcome of a good faith agreement to arbitrate. This comports with the minimum contacts determination that the defendant "should reasonably anticipate being haled into court" in the forum's jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *but see Creighton,* 181 F.3d at 127 (citing *Burger King v. Rudzewicz,* 471 U.S. at 478, 105 S.Ct. 2174, "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." (emphasis in original)). In *Creighton,* the district court for the District of Columbia, held that Qatar was not subject to personal jurisdiction under a minimum contacts and purposeful availment analysis, because the contract "was offered, accepted, and performed in Qatar pursuant to a sponsorship arrangement between Creighton and a Qatari contractor." *Id.* at 127-28. In addition, the contract specified that it was subject to the laws of Qatar, payment was made in Qatari riyals to Creighton's bank account in Qatar, and the alleged breach occurred in Qatar. *Id.* at 128.

The Ministry misstates the situation by arguing that finding personal jurisdiction violates the notions of "fair play and substantial justice" because the Ministry was involved in only one regulatory act, that of approving the contract to import wheat, concerning a contract which was "negotiated, executed, and

17

performable in Yemen."  We disagree.  Having determined that the Ministry was involved in more than "one regulatory act," the contract itself anticipates further contacts between the two nations.  One of the parties to this contract was a United States corporation who was required to provide "U.S. wheat No. 2 or better" (none of which is grown in Yemen) to be imported to Yemen.  Performance logically required contact and interaction with the United States, as discussed in the contract (such as designating a U.S. bank for payment and a point of departure for shipping).  Unlike the facts of *Creighton,* the contract did not state it was subject to the laws of Yemen, there were direct dealings between parties of both countries, *see Francosteel Corporation v. M/V CHARM,* 19 F.3d 624, at 628 (11th Cir.1994), and the direct effect occurred with the defendants' failure to open the letter of credit at the New York bank.  "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

For the foregoing reasons, we find that the Ministry is not entitled to sovereign immunity under the FSIA because the arbitration exception, § 1605(a)(6)(B), and the commercial activity exception, § 1605(a)(2), apply under the factual circumstances alleged at this juncture.  Furthermore, the district court does have personal jurisdiction over the Ministry.  Therefore, the district court's order denying the Ministry's motion to dismiss is AFFIRMED.